Opinion

per curiam:

These cases were referred by the court pursuant to Rule 45 (c) to the Honorable W. Ney Evans, a commissioner of the court, with directions to make findings of fact bearing only on the issue of liability, and to make recommendations as to the legal conclusions which the court should arrive at, as a result of the findings and the applicable statutes and legal principles. Commissioner Evans has done what he was di *367 rected to do, and we approve and adopt as onr own his findings and opinion.
The evidence indicates that the work of the Customs Patrol was not the kind of work which could be easily accommodated to a 5-clay, 40-hour week. The detection and pursuit of smugglers could not be stopped at 5:00 o’clock and resumed at 8:00 the next morning. It may be that Congress would have been well advised to omit such employees from the Overtime Pay Act of 1945, or to make some different arrangement for their compensation. But Congress did not omit them, and their superiors were not authorized to deny to them the benefits of the act, on the ground that the administration of the act would be difficult, almost to the point of impossibility, or that money had not been provided to pay the employees what they were entitled to under the law.
If the superiors of the Customs Patrol officers had recognized, as they should have, that the Overtime Pay Act was applicable to them, they might well have scrutinized more carefully the reports of their activities and the time spent in those activities. Instead, they merely put the officers down for an 8-hour day, no matter how many hours they reported having worked. Any police officer whose job it is to patrol roads or streets to detect violators of the law does not, happily, very often encounter violators. His activities might seem to others, and perhaps to himself, largely futile, but that is his assigned job and it is, in fact, a useful job. However, when he is acting outside his formally assigned hours, and is claiming pay for so acting, he has the burden of showing that what he does is worth doing, and is reasonably calculated to promote the end for which he is employed.
With particular reference to the instant case, we do not, at present, see how attendance for several hours at a basketball game or a dance would be likely to have any relation to detecting smugglers. In further proceedings under Rule 38 (c) to determine the amount of compensable overtime of each plaintiff, his activities during the alleged overtime period will have to be looked at with care.
*368 OPINION OF COMMISSIONER EVANS
In these three cases 42 former patrol inspectors of the Customs Border Patrol seek to recover payment under the Federal Employees Pay Act of 1945 for overtime services. That each of the plaintiffs worked some hours in excess of 40 during some of the administrative workweeks within the periods of their claims is not disputed. The only question presented is whether or not these services were officially ordered or approved within the meaning of the statute.
The statute and the regulations issued under it have been considered by this court in Post v. United States, 121 C. Cls. 94 (1951), Tabbutt v. United States, 121 C. Cls. 495 (1952), Goldstein v. United States, 121 C. Cls. 495 (1952), Matlack v. United States, 121 C. Cls. 495 (1952), Farley v. United States, 131 C. Cls. 776 (1955), and Gaines v. United States, 132 C. Cls. 408 (1955).
The plaintiff in the Post case, sufra, failed to prove that he had in fact performed any overtime work, and was denied recovery for that reason in a per curiam opinion.
Tabbutt, Goldstein, and Matlack, supra, were decided together. The plaintiffs were denied recovery for overtime which they had worked, as shown by their daily reports, because the overtime had not been authorized or approved by any official who had authority to do so.
The extra hours which the plaintiff in Farley, supra, spent in duty status were held to constitute overtime work, which was .further held to be compensable under the statute, notwithstanding plaintiff’s agreement to perform the extra duty as a condition of her employment. An order directing the plaintiff to “remain on duty” satisfied the requirements of the statute and the regulations that the overtime should be officially ordered or approved, in writing, although the directive neither ordered nor approved the extra duty as compensable overtime.
Gaines, supra, was presented on cross motions for summary judgment. The claim for overtime compensation failed because, as the opinion points out, “the affidavits and exhibits in evidence here fail to show that any overtime was ordered *369 or approved, either orally or in writing, or that plaintiff requested such authorization or approval.”
The statute explicitly provided for the payment of extra compensation for overtime hours “officially ordered or approved,” and authorized the issuance of “such regulations * * * as may be necessary for the administration of * * * this Act.” The regulations provided that “no overtime * * * shall be ordered or approved except in writing by an officer or employee to whom * * * authority has been specifically delegated by the head of the department * * *.”
In the cases now under consideration plaintiffs maintain that the overtime work was “required” of the men by their supervisors, and was therefore “ordered”. Defendant replies (1) that the supervisors lacked the authority either to “require” or to “order” the overtime, (2) that, at most, the supervisors did no more than to “encourage” the men to work the overtime, and (3) that the overtime was in fact voluntarily performed.
Some of the conflicting interpretations of fact, as between plaintiffs and defendant, have been resolved if not eliminated by the findings herein, which describe the overtime as having been “induced” rather than “required” or “encouraged”. Moreover, the inducement began with the Commissioner of Customs and applied to the supervisory officers as well as the men. The patrol inspectors were not volunteers, in the unfettered sense of the term, nor were they responding to the spontaneous zeal of their immediate supervisors.
If, under the facts, the services could be said to have been performed voluntarily within the full meaning of the word, the decision in Farley, supra, is authority for the services being compensable notwithstanding. The analysis in the Handh/, Schaible, and Sanderson cases, filed January 16, 1956, is to the same effect.
The overtime services were not voluntarily performed, however, because the patrol inspectors were never given a free choice. The plain fact of the matter is that the 40-hour week, established by the 1945 Pay Act, was never translated by the Customs Service into an effective, administrative reality for the patrol inspectors. Before the war they worked *370 unlimited hours for which each received an annual salary, divided into segments by pay periods. During the Avar they worked unlimited hours, although the pay was restricted to a 40-hour base plus 8 hours of overtime each week. After the Avar*, the pay was limited to a straight 40-hour weekly base, but the hours of Avork remained unlimited because of the inspectors’ response to the inducements of their superior officers, including- the Commissioner of Customs.
The failure of the Commissioner of Customs to translate the 40-hour week into administrative reality for the patrol inspectors, and his suggestion of “voluntary” overtime to the district superintendents and their subordinate supervisory officials, together with his knowledge of the use made by them in rationalizing the extension of “voluntary” overtime, afford ample evidence of approval of the overtime Avorked by the plaintiffs by an official with authority under the statute and the regulations to give such approval.
The mandate of the statute is that “* * * employees shall, in addition to their basic compensation, be compensated for all hours of employment, officially ordered or approved, in excess of forty in any administrative workweek * * *.” The Commissioner of Customs, as the authorized deputy of the Secretary of the Treasury, had authority under the statute to order or approve the overtime hours of emploment. While he did not order the work to be performed, he certainly knew and approved of its being done.
The statutory compensation for overtime services performed with the knowledge and approval of the Commissioner of Customs is therefore due to the patrol inspectors unless payment must be denied because the Commissioner and his subordinates meticulously eschewed putting any order for or approval of such overtime in writing.
The writing was required by the regulations, not by the statute.
In withholding written orders for or approval of the overtime, the Commissioner and his subordinates intended to withhold compensation for the services performed. They frankly and candidly asserted this intention, and the patrol inspectors were fully advised that extra compensation would not be paid for the extra hours. There is no question of the *371 good faith of the Commissioner or bis subordinates. Plaintiffs do not charge them with conscious subterfuge.
The finding herein is that the Commissioner and his subordinates rationalized the concept of voluntary overtime into the course of conduct by which the patrol inspectors were induced to perform the overtime work. Under the circumstances, their action resulted in subterfuge, albeit subconscious. The withholding of written orders or approval reflected observance of the letter of the regulation but denial of the substance of the statute.
Among the objectives of the 1945 Pay Act were economy and efficiency in the employment of personnel and in the use of employees’ time. The framework of basic and administrative workweeks, and the definition of overtime work are even more explicit. Under the circumstances, the mandate to pay additional compensation for overtime hours, when the work was, as here, officially ordered or approved, is overriding. Once the overtime work is officially ordered or approved by responsible, authorized officials, and is performed by the employees, appropriate compensation is mandatory. The collateral intentions and purposes of the responsible officials are immaterial.
FINDINGS OF FACT
1. (a) The claim of each of the plaintiffs in each of these cases[1] is for additional pay for services performed by him as a customs patrol inspector[2] and rests upon the application of the overtime provisions of the Federal Employees Pay Act of 1945.[3]
(b) Each of the plaintiffs is a citizen of the United States and was, during the period covered by his claim, a duly appointed customs patrol inspector who acted in that capac *372 ity in the performance of the patrol services involved in his claim.[4] The period covered by plaintiffs’ claims extends from July 1,1945,[5] to July 24,1948.[6] The suits were filed in 1951.[7]
2. (a) During the period covered by these suits the Customs Patrol was part of the Customs Agency Service within the Division of Investigation and Patrol of the Bureau of Customs of the Treasury Department. The line of administrative authority ran from the Secretary of the Treasury to the Commissioner of Customs to the Deputy Commissioner of Customs for Investigation and Patrol to three District Superintendents:[8] one for the Northeast, one for the Northwest, and one for the Southwest Patrol District.[9]
(b) Within each district the service was divided into companies, to each of which was assigned a specified geographical area. Each company was under the direction of a captain,[10] who reported to and received orders from the superintendent of his district. A lieutenant, subordinate to the captain, was attached to each company. The area assigned to a company was divided into zones, for each of which there was a zone sergeant; and each zone was divided into stations, to each of which two or more patrol inspectors were assigned. The station territory was not subdivided. Each patrol inspector was charged with responsibility for knowledge of and activity throughout the station area.
*373 (c) The purpose of the Customs Patrol was to prevent frauds on the revenue of the United States through the detection and punishment of smuggling across the borders from Canada and Mexico.[11] The border patrol was first established in 1853, to police traffic in a border area between Texas and Mexico.[12] There was important work for it during the Civil War, and its growth as a service dates from that conflict. As the service was extended over the whole of the frontiers with Mexico and Canada, the officers, wearing uniforms and patrolling on horseback, were encouraged in the development of traditions of courage and esprit de corps commonly associated with their counterparts in law enforcement, the Texas Eangers and the Canadian Eoyal Mounted Police.[13]
*374 (d) During the period of the claims in suit, much of the patrolling was done by automobile,[14] usually with two men in a car, comparable to the police scout cars commonly seen on city streets. Except for changes brought about by automobiles and highways, the Customs Patrol remained much as it had been for many years. The officers were required to wear uniforms, and elaborate regulations prescribed when and how to wear them and what an officer could and could not do while in uniform, all being directed to the upholding of the majesty of the law, the dignity of the service, and the pride of the officers in having responsible parts in the undertaking.
3. Officers in the Customs Patrol Service were restored to the competitive classified civil service in 1932.[15] During the periods involved in these suits they were in the competitive classified civil service and were subject to usual civil service methods of appointment and promotion, including job descriptions and efficiency ratings.
4. Following is the job description of a customs patrol inspector (journeyman) CAF-7, in use during the times material to these suits:[16]
After successful completion of a one-year training-period, performs the following duties under general supervision:
(a) Patrols an area along the international boundary to detect and prevent smuggling and other violations of the customs and related laws;
(b) Develops sources of information, maintains observation of suspected violators, and investigates general *375 and particular information concerning violations of the customs and related laws;
(c) By observation and through local contacts keeps currently informed concerning legal movements of livestock and produce across the international boundary in order to detect illegal movements;
(d) Pursues and detains vehicles and craft whose operators are known or suspected to have failed to report to customs as required by law;
(e) Inspects and searches vehicles and craft which are believed to have crossed the international boundary without proper report to customs and searches the bag-gages and, if necessary, the persons, of the occupants of such vehicles and craft to detect contraband;
(f) Seizes contraband and vehicles and craft that are carrying or have carried smuggled merchandise, and arranges for their safe-keeping;
(g) Arrests violators of the customs and related laws;
(h) Makes reports of all activities, secures evidence and witnesses for judicial proceedings against law violators and contraband merchandise, and testifies in such proceedings;
(i) Benders such assistance to other Federal agencies, such as the Immigration and Naturalization Service and the Federal Bureau of Investigation, and to State agencies, such as those concerned with forest and game protection and law enforcement,. as may be consistent with customs requirements and likely to promote cooperation in the enforcement of the customs and related laws.[17]
5. (a) No explanation is required of the surveillance, pursuit, and arrest of identified suspects, or of the search for a seizure of known contraband, or of the part of the patrol officers in the prosecution of the offenders.
The nature of the work involved in the identification of suspects and contraband, and in the prevention of smuggling (as distinct from the punishment of it), is not so apparent.
*376 (b) Two techniques were principally used for the identification of suspects and contraband: one was by way of knowledge of the people and products of the station area, whereby the officer could quickly detect and properly analyze new or unusual movements of persons or things;[18] the other was by way of informers.[19]
(c) Each patrol officer was encouraged to become personally acquainted with as many people as possible in his station area; to stop by and visit with residents from time to time; to know their work and their property interests,— specifically to know of such things as imports and exports, brands used on cattle, and impending or anticipated shipments of merchandise or movements of stock. Each officer extended and maintained his knowledge accordingly, making occasion when need be and taking advantage of opportunity otherwise.
While the extent to which this kind of endeavor could be pursued on the Canadian or Mexican side of the border was limited, the officer’s knowledge (and consequently his effectiveness) was enhanced by whatever he could do in this direction.
(d) For the prevention of smuggling the Patrol Service relied considerably on the frequent appearance and presence of patrol officers at various places throughout their stations, and at varying and odd hours of the day and night. The purpose was to create and foster the impression that the watchful eye of the law was ever present. Patrol officers were encouraged to arrange their work and schedule their hours accordingly.[20]
*377 In the Southwest Patrol each officer was advised to learn to speak and understand Spanish,[21] as an aid to knowledge of the station area people and especially for use in dealing with informers.
(e) Patrol officers were expected to develop their own informers.[22] In addition to other law enforcement officers and persons motivated by friendship for the patrol inspector, the officers were instructed to listen to and sift carefully information given to them by persons actuated by idealism or a spirit of reform and by persons actuated by motives of hatred or revenge. Especial emphasis was reserved for persons actuated by hope for reward, and each patrolman was expected to find and cultivate his own paid informers.[23]
6. (a) The underscored elements in the Efficiency Eat-ings[24] of patrol inspectors included (1) accuracy of judgments or decisions, (2) rate of progress on or completion of assignments,[25] (3) effectiveness in meeting and dealing with others, (4) initiative, (5) dependability, and (6) physical fitness for the work.
(b) Efficiency ratings for patrol inspectors were initially prepared by the company commander and were reviewed in the district headquarters. These ratings were vital to promotions, including periodic within-grade salary increases.[26]
*378 7. (a) During tbe periods covered by the claims in suit the operations and work of the Customs Patrol remained much the same as they had been for many years prior to 1945. The officers were encouraged to make the Service their main interest in life, and to devote to it as much energy, thought, and self discipline as were necessary to maintain its traditionally high standards.[27]
(b) The response of the patrol officers to the Service’s appeal for devotion to duty proved the effectiveness of the appeal. Most of the officers worked long hours every day and every week. Many of the hours were spent in arduous labor or under trying conditions. The extent to which the officers were ordered on any specific assignment or for any particular tour of duty was limited. Tasks were assigned, which the officers were expected to perform. The assigned tasks could not be performed in limited hours or on stated schedules. The officers performed their work in response to leadership predicated upon a carefully developed high-minded esprit de corps throughout which there was interwoven a subtle but fully understood indication of the way to promotion and pay, and to tenure in office, itself. This situation prevailed after the adoption of the Federal Employees Pay Act of 1945 as well as prior thereto.
*379 8. (a) Prior to World War II there was no general provision for the payment of additional compensation to civilian employees of the United States for overtime work. On the contrary, the Act of March 8, 1893,[28] as amended,[29] directed the heads of departments “* * * to require of all * * * employees * * * not less than seven hours of labor each day, except Sundays and * * * holidays,” and provided that such hours might, by special order, be extended, and that “in case of an extension it shall be without additional compensation; * *
The standard (minimum of seven hours per day, six days per week, resulted in a workweek of 42 hours, which was reduced to 39 hours (seven hours each day, Monday through Friday, and four hours on Saturday) by the Saturday half-holiday law of 1931.[30]
Hours in excess of the minimum standard were prescribed for many employees, among whom were various classes of customs employees. The payment of additional compensation for such excess hours was exceptional, and was made only under specific authority.[31]
(b) The Customs Manual of 1943,[32] following the pattern which had been in effect for many years,[33] prescribed a work *380 week of 39 hours (seven hours Monday through Friday and four hours on Saturday) for customs officers and employees generally, and a workweek of 44 hours (eight hours Monday through Friday and four hours on Saturday) for such classes of employees as samplers, mechanics, guards, et cetera, and provided explicitly that such hours “may be extended as the needs of the Service demand and such extension shall be without additional compensation * * *.” For officers of the patrol service, from superintendents to inspectors, the Manual provided that they “shall be subject to duty at any time for such hours as the circumstances of their assignments may demand.”[34]
(c) With respect to the only class of customs employees as to which there was statutory provision for the payment of extra compensation for overtime work (viz., port inspectors) , Customs regulations carefully distinguished between compensable (“reimbursable”) overtime and uncompensated overtime. Assignments of port inspectors at border ports to duty on uncompensated overtime were standard practice prior to December 1, 1944-.[35]
9. (a) The 40-hour week first gained wide acceptance in the United States as a result of industry codes adopted under the National Industrial Recovery Act of 1933. During the remainder of the 1930’s the 5-day 40-hour week became the established pattern in many industries, and was extensively used in collective bargaining agreements, many of which provided for the payment of overtime for work in excess of the established hours.
*381 (b) Beginning in 1940, the national defense effort made it necessary for one Government agency or department after another to conform, in part at least, to the working hours and pay standards of industry, in the administration of defense contracts.[36]
This need was intensified and the trend accelerated after the United States entered the war in December 1941.
The suspension of the Saturday half-holiday law was begun in 1940,[37] and was renewed and extended in 1942[38] and 1943.[39]
The Joint Besolution of December 22, 1942,[40] extended “* * * the authorization contained herein to pay overtime compensation * * * to all civilian employees in or under the United States Government * * subject to exceptions not here material. This authorization, limited to April 30,1943, was extended by the Act of May 7, 1943,[41] to expire on June 30,1945.
(c) Pursuant to the statutes cited in the preceding paragraph, and to executive orders and regulations, the standard wartime workweek in the Federal service became 48 hours, composed of a basic workweek of 40 hours and eight hours of overtime (for which employees were compensated) to make an administrative workweek of 48 hours.
(d) Just as the authorization of the Joint Besolution of December 22, 1942, would have expired if it had not been extended, so the extended and expanded authorization of the Act of May 7,1943, would have expired on June 30,1945, had it not been for the Federal Employees Pay Act of 1945,[42] *382 which was approved on June 30 and by its terms made effective on July 1,1945.[43]
(e) The wartime pattern of a workweek of 48 hours, with overtime pay for eight hours, applied to officers and employees of the Customs Service generally, including officers of the Border Patrol.
10. (a) The Federal Employees Pay Act of 1945 repealed the laws relating to the 7-hour 6-day workweek[44] and the Saturday half-holiday.[45] The statute was, according to its title, “An Act to improve salary and wage administration in the Federal service; to provide pay for overtime and for night and holiday work; * * * to bring about a reduction in Federal personnel and to establish personnel ceilings for Federal departments and agencies; * *
(b) The legislation was considered and adopted after the defeat of Germany but before the surrender of Japan. While provision was made accordingly for maintenance of the standards and methods in use during the prosecution of the war, the statute looked beyond and set forth standards to be applied “upon the cessation of hostilities in the present war.”
(c) The Act (1) increased the rates of basic compensation provided by the Classification Act of 1923; (2) established a basic administrative workweek of forty hours (to be performed within a period of not more than six of any seven consecutive days); (3) directed that additional compensation be paid “for all hours of employment, officially ordered or approved, in excess of forty hours in any administrative workweek” at specified overtime rates;[46] (4) authorized compensatory time off duty in lieu of overtime compensation for irregular or occasional overtime work;[47] (5) ordered *383 payment of a ten percent differential for night work (between 6 p. m. and 6 a. m.); (6) specified time and one-half for work on holidays (effective “upon the cessation of hostilities in the present war”) ; and (7) ordered a quarterly review of the employment needs of departments and agencies “for the purpose of determining the numbers of * * * civilian employees * * * required * . * * for the proper and efficient performance of * * * authorized functions * *
11. (a) On July 2, 1945, the Secretary of the Treasury advised the heads of all bureaus in the Department that “* * * the basic administrative workweek for all full-time officers and employees in the Treasury Department except as hereinafter provided shall consist of 8 hours each day from Monday through Friday, inclusive.” The Secretary’s order continued: “The heads of bureaus * * * are hereby authorized to establish a different basic administrative workweek, not exceeding five 8-hour days in any consecutive seven days, in those services where it is necessary that work be performed on every day in each week. This exception applies to such classes of employees as * * * border patrolmen * * *. The Director of Personnel shall be advised * * * as to the * * * employees, including their basic administrative workweek, coming within the provisions of this paragraph. * * *”
(b) On July 3, 1945, the Commissioner of Customs advised the bureau’s field offices that: “* * * The basic workweek for customs employees such as customs patrol inspectors * * * whose wrork must be performed on every day in each week * * * shall consist of 8 hours each day on the first five days on which work is performed in each consecutive 7 days beginning with a Sunday. Any work performed on the sixth or seventh day * * * shall constitute overtime work. * * *” '[48]
(c) On July 4, 1945, Executive Order 9578[49] directed the heads of departments to establish, with respect to each group of full-time employees, (1) a regularly scheduled basic workweek of 40 hours and (2) a regularly scheduled adminis *384 trative workweek consisting of the 40-hour basic workweek plus such period of overtime work as will be regularly required. The order further specified that all affected employees should be paid overtime compensation for all hours of employment officially ordered or approved in excess of 40 hours in any administrative workweek, including irregular or occasional overtime duty; and authorized heads of departments to delegate “to any officer or employee” authority to order or approve overtime, provided that: “No overtime in excess of the administrative workweek shall be ordered or approved except in writing by an officer or employee to whom such authority has been specifically delegated * *
(d) On July 9, 1945, the Director of Personnel of the Treasury Department issued to heads of bureaus and chiefs of divisions Personnel Circular No. 72, which conformed the Treasury’s basic workweek and administrative workweek to the terms of Executive Order 9578, and provided, in part, as follows:
* * * Basic compensation is earned when an employee has worked * * * 40 hours in each week. * * *
Overtime work in excess of 48 hours must be approved in advance by the Director of Personnel. * * *
On July 13, 1945, the foregoing Personnel Circular was amended to provide that:
In the Bureau of Customs occasional overtime work in excess of the regularly scheduled administrative workweek (48 or 44 hours) may be directed by local supervisory officers in emergent situations, but in each such case the matter shall be reported promptly to the Commissioner of Customs.
(e) On July 16, 1945, the Commissioner of Customs directed that: “Principal local administrative officers are authorized in emergent situations to direct employees under their supervision to perform occasional overtime work in excess of their regularly scheduled administrative workweek. A full explanation of such occasional overtime shall be made to the Bureau promptly.”
*385 (f) A letter of advice from the district office to all officers and employees of the Northwest Patrol, dated August 18, 1945, contained the following:
It will be the policy of this district that the overtime day will be the only overtime which will be compensated. Any time worked in addition to each of the 8-hour workdays of the basic workweek of 40 hours, and any time in addition to the 8 hours for the overtime day, for a total of 48 hours in the administratively fixed workweek, will not be compensated. In other words, if you work 9 or 10 hours during any of the 8-hour workdays, you will be paid for only 8 hours’ time. If you insist that you should be compensated for the unscheduled additional hours which you might put in during any workweek, you may direct a letter to the Superintendent requesting compensatory time in lieu of that time which you can justify as being overtime which was required for the good of the Service. The Superintendent is authorized to approve or disapprove such a request.
(g) The following excerpt from the same letter of advice was a portent of things to come:
The first item in the Customs Patrol Inspector’s classification is: “(a) Patrols an area along the International boundary to detect and prevent smuggling and other violations of the Customs and related laws.” That part of the specifications is the heart of all patrol operations. The work of a patrol inspector is unique in character in that enforcement operations can not be governed by time. Crime is not scheduled by the clock. In our work, we detect, pursue, seize, and arrest by opportunity, because of some premeditated scheme to violate. Customs violations are very rarely committed without some form of forethought by an individual or group of individuals. It would be difficult to successfully combat such breach of law between the hours of 6 a. m. and 6 p. m. We can not put aside our kind of work at 5 p. m. and lock a door against a chain of circumstances until _ 8 o’clock the next morning and expect evidence to remain intact for our convenience. The patrol officer whose work is half done has accomplished nothing. We are grateful that our personnel is not made up of officers who elieve enforcement procedure can be regulated by time and that the violator will consistently operate during *386 the daylight hours for the convenience of any enforcement officer. The darkest night in the toughest weather at the unusual hour is the time a smuggler finds security against detection and apprehension. That is the vital hour for patrol operations. Your assignment is that part of the International boundary within your patrol district. You are free to use your own initiative and good judgment as to when, where, and how you will work your territory so as to successfully protect the revenue of the United States.
We appreciate the fact that our patrol officers do disregard any time-table of operation and that each of you is vitally interested in the success of your assignment; and in devoting yourself completely and continually to your assignments, it is acknowledged that your work has not been easy, smooth, or peaceful. Your interest and the thoroughness with which you have fulfilled your position have been appreciated.
12. The new pay act was fraught with many problems of administration other than the payment of additional compensation for overtime work and as night differentials. Every administrative office had to adjust to biweekly payrolls, revise schedules of work that had to be done every day and at night, and adapt to the new requirements relating to allowances of leave (sick and annual).
On the administrative level of the district superintendents of patrol and below, the officers were struggling with the necessary adaptations of paper work on the basis of the wartime workweek of 48 hours, when Japan suddenly capitulated (in mid-August 1945) and hostilities ended. This event was followed by a quick transition to the straight, basic 40-hour workweek, with the overtime pay eliminated.
13. (a) On August 24,1945, the Commissioner of Customs advised all principal customs field officers that:
* * * Beginning * * * Sunday, August 26,1945, the administrative workweek for employees of the Customs Service, other than customs * * * employees (not including employees of the Customs Border Patrol)[50] whose work must be performed on every day in each week, shall be 40 hours * * *.
*387 * * * No schedule of regular hours of business * * * shall be established in such manner as to require overtime services of any * * * employee except under most unusual circumstances. * * *
* * * The Bureau offices in Washington will be closed on Saturdays after August 26,1945.
(b) On August 25, 1945, the Commissioner of Customs wrote to the District Superintendent of the Southwest Patrol as follows:
The provisions of the Federal Employees Pay Act of 1945 and the establishment of the 40-hour workweek present grave problems in the execution of the functions of our border patrol that can be met only with the exercise of good judgment and loyal cooperation on the part of all members of the patrol forces.
The problem to be met is clearly that of justifying the continuance of border patrol work with really effective coverage but without any increase in authorised force, without payment of overtime in any but the most exceptional circumstances, and without depriving employees of the benefits contemplated for them by the 40-how legislation.
The effective distribution of patrol coverage through allowance of compensatory time becomes impossible with the discontinuance of the 48-hour week, since compensatory time may be allowed only for work performed in excess of 48 hours in any 7-day period. Effective coverage through the employment of sufficient additional personnel is clearly impracticable. Partial coverage of patrol work on fixed schedules is obviously so ineffective that any resort to that system would be followed soon by total discontinuance of patrol activities as contemplated by our present organization.
Bearing the foregoing considerations in mind, each member of your organization who is engaged in patrol work, i. e., patrolman, sergeants, lieutenants, and captains, shall be required to perform his assigned duties during 8 hours on each of 5 days in each calendar week, except when absence from work is properly authorized and charged as annual or sick leave or leave without pay. Five of the 10 tours of duty in each pay period, or the accumulated equivalent thereof, shall be performed between the hours of 6 p. m. and the following 6 a. m. and the night pay differential authorized by section 301 of the Federal Employees Pay Act of 1945 shall be paid accordingly. For example, there may be 5 tours between 6 p. m. and 6 a. m., or 3 such tours and 2 between 2 a. m. *388 and 10 a. m. and 2 between 2 p. m. and 10 p. m., or any equivalent by which the total hours of service between 6 p. m. and 6 a. m. in any pay period will amount to 40 hours.
Although it will be impracticable to schedule the exact hours of each tour of duty from headquarters in advance in most cases, supervisory officers shall maintain close observation of work reports and make frequent contacts with subordinate employees to satisfy themselves that effective work is being performed. There will be no objection whatsoever to the performance of regularly assigned duties on a voluntary basis, but employees shall not be held accoumtable in any way for failure to work more than Jfi hours in any week unless assigned under exceptional circumstances to perform overtime work for which additional compensation is payable.
The Bureau will welcome any suggestions as to additional measures which may be adopted to insure maintenance of the magnificent record of the Customs Border Patrol with assurance to its members of the benefits afforded them by Federal employee legislation. [Emphasis supplied.]
(c) Under date of August 28,1945, the District Superintendent of the Southwest Patrol forwarded to all employees of the district a memorandum which specified that “the administrative workweek of all employees of the Southwest Customs Patrol will consist of five 8 hour work days” with part of the time subject to night assignment, and concluded with the following:
The problem to be met is clearly that of justifying the continuance of border patrol work with really effective coverage but without any increase in authorized force, without payment of overtime in any but the most exceptional circumstances, and without depriving employees of the benefits contemplated for them by the 40-hour legislation. These problems cam be met only with the exercise of good judgment and loyal cooperation on the part of atl members of the patrol force. [Emphasis supplied.]
(d) On the same day, August 28, 1945, the District Superintendent of the Southwest Patrol forwarded to the commanding officers of the four companies in his district a memorandum which (1) set forth the text of the letter quoted *389 in subparagraph, (b) of this finding; (2) specified that “all employees are now entitled to two days off duty during each 7-day period * * (3) invited specific attention to the fourth and fifth paragraphs of the quoted letter (relating to night assignments, observation by supervisory officers, and the absence of objection to voluntary overtime); and (4) directed the commanding officers to “* * * designate * * * days off duty * * *” and to schedule hours for each tour of duty.
(e) In the Northwest Patrol the District Superintendent, under date of August 30, 1945, forwarded to all employees of the district a memorandum which set forth the text of the circular letter quoted in subparagraph (a) of this finding and continued, in part, as follows:
* * * no fixed schedule shall be set up by patrol inspectors for patrol coverage of the International Boundary. The hours shall be staggered over the 24-hour period of each day of the calendar week. The hours of patrol duty shall be arranged among the patrol officers so as to maintain an adequate and efficient protection of the Revenue of the United States.
* * * No employee shall be held accountable in any way for failure to work more than 40 hours in any week, unless assigned * * * to perform overtime work for which additional compensation is payable.
50% of the patrol activity * * * shall be performed between the hours of 6 p. m. and 6 a. m. * * * The night pay differential * * * shall be paid * * *.
Reference is made to our letter of August 18, wherein it was stated that the Federal Employees Pay Act did not change the duties of a customs patrol inspector, except that each of you were placed on a 40-hour week with an increase in basic pay * * *.
* * * We at District Headquarters are proud of the fact that * * * you are still ready to stand by and assist during the days of readjustment that are ahead; that each of you will be out there plugging the holes in the Border regardless of what the rules may be. And in that respect, we want you to know that there will be no objection to the performance of adidtional duties on a voluntary basis * * *.
In closing, we wish to again state that you will not be subject to any criticism, nor will you be held accountable in any way, for failure to work more than 40 hours in any calendar week.
*390 14. (a) On September 28,1945, the Commissioner of Customs issued a notice addressed to all customs officers and employees setting forth Amendment No. 103 of the Customs Manual of 1943. Pertinent excerpts follow:
Section 27.69 * * * is * * * amended to read as follows :
27.69 * * * (e) The basic workweek of each member of the customs border patrol engaged in patrol activities, i. e., * * * inspector, sergeant, lieutenant, or captain, shall be 8 hours on each of 5 days in each calendar week. * * * 5 of the 10 tours of duty in each pay period * * * will be performed between the hours of 6 p. m. and the following 6 a.m. * * * In view of the nature of patrol work and the impracticability of timely communication between patrol officers and their supervisory officers, each patrol officer may be authorized generally or from time to time by the * * * district superintendent to schedule his own tours of duty in accordance with this paragraph and make periodic reports of such schedules.
* * * _(h) No schedule of regular hours * * * shall be established * * * in such manner as to require overtime services of any customs employee without the prior approval of the Commissioner of Customs.
(i) Each principal local customs officer is authorized in cases of real emergency to direct any employee under his supervision to perform occasional overtime work * * *. A full explanation of each instance * * * shall be reported * * * promptly * * *.
(b) In subsequent communications to the field during the closing months of 1945 the Commissioner of Customs gave emphasis to the necessity for the Bureau to limit authorizations for overtime to situations of emergency, because of lack of funds with which to pay for it, and stressed the need to eliminate overtime payments entirely after January 1, 1946.
15. (a) As indicatedby the letter of the Commissioner of Customs set forth in finding 13 (b), the transition to the 40-hour week in August 1945 presented serious problems to the Border Patrol.
(b) Everyone concerned, from the Commissioner of Customs to the patrol inspectors, was convinced that the patrol service could not be operated on a schedule of either eight hours per day or 40 hours per week.
*391 The standards of the service theretofore established had required the men, from inspector to district superintendent, to work 48 to 60 hours or more per week. Personnel strength for the service had been set on this basis. The spirit, if not the letter, of the Federal Employees Pay Act of 1945 forbade any request for additional personnel. In prior years the performance by the patrol had been cited in justifying continued appropriations for it. If the standard of performance was permitted to decline, the Bureau might not be able to continue to justify the patrol service.
(c) Throughout the war period, and until August 26,1945, patrol inspectors had received basic compensation for a 40-hour week and overtime pay for another 8 hours. Elimination of the overtime pay put them in the position of either adhering on their own responsibility to the 40-hour week, or of doing the job as before, using 48 to 60 hours, at the rate of pay applicable to the basic 40-hour week.
16. (a) From the outset of the dilemma the great majority of the officers in the patrol, from superintendent to inspector, responded to the invitation of the Commissioner of Customs for * * the exercise of good judgment and loyal cooperation * * In short, they continued working as before, maintaining the standards of the service.
During the next 12 months the responsible administrative officers of the patrol service developed and infused into the organization a rationalized program which they thought met the letter of the law and at the same time made it possible to continue the service on the standards theretofore established. The key to their program, ultimately described in honest language openly used, was “voluntary overtime.” The patrol service was administered under this program from the inception of the 40-hour week in August 1945 to the final abolition of the service three years later (July 1948).
(b) The administrative officers of the patrol service, from district superintendent to zone sergeant, meticulously observed the letter of the law in respect to formal authorization of and payment for overtime work.
In the Northwest Patrol there was no instance of overtime authorized for compensation from the enactment of *392 the pay statute (July 1945) to the abolition of the district (in March 1947). In the Southwest Patrol there was but one such instance between July 1945 and the abolition of the district (in July 1948), and the district superintendent was hard pressed by the Commissioner of Customs to justify that one.
Five-day weeks were established by means of designating two days out of seven as days off duty. Leave records were adjusted accordingly, and patrol inspectors who carried night work into the hours of an off-duty day were denied the night differential therefor, as well as overtime.
Everyone in the patrol was made to understand that there would be no payment for overtime work, whatever the circumstances.
(c) Formal communications from the district headquarters advised the patrol inspectors from time to time that their basic workweek was 40 hours and that none would be penalized for failure to work longer hours. The district superintendents were at pains not to order any inspector to work hours in excess of 40 in any one week and to see to it that no such orders were given by company commanders or their subordinates, the lieutenants and the zone sergeants. The inspectors were instructed to make .up their time and attendance reports (from which payrolls were drawn) in such way as to show tours of duty of eight hours only on each of the five days of each week.
(d) The patrol inspectors were further instructed to record on their daily reports (using printed forms differing completely from the time and attendance reports) all of the hours worked. It was these (the daily) reports that went to company headquarters for review by the officers who would make up the efficiency ratings and submit recommendations for promotion.
(e) Within a year after the inception of the 40-hour week the responsible administrative officers of the patrol service had so convinced themselves of the validity of their rationalization of voluntary overtime that they wrote it into the *393 training course materials for both the Northwest and the Southwest Patrols.[51]
(f) Meanwhile, no action was taken by the Patrol to indicate or even to suggest to a patrol inspector how he could perform his work, effectively and acceptably, within 40 hours per week.[52] On the contrary, every administrative device and the tone and content of instructions were so cast as to imply (if not overtly to state) the opposite.[53] Against these clear indications and implications of the desires of his administrative superiors, the patrol inspector was free to consider, and, if he chose, to act upon, the barren advice that by law he could not be required to work more than 40 hours per week.
17. (a) There is no contention in these cases that, with respect to any of the plaintiffs, any overtime in excess of the administrative workweek was ordered or approved in writing by an officer or employee to whom such authority had been specifically delegated, within the meaning of Executive Order 9578;[54] or that occasional overtime work in excess of the regularly scheduled administrative workweek was directed or required by principal local administrative officers, within the meaning of the directive of July 16,1945, by the Commissioner of Customs,[55] or the provisions of the Customs Manual, as amended on September 28,1945.[56]
(b) There is no contention in these cases that, with respect to any of the plaintiffs, the daily reports would not show *394 hours worked in excess of 40 during many administrative workweeks within the periods covered by the claims. Defendant concedes that each of the claimants worked overtime.
18. (a) Plaintiffs contend that they were “required” to work the overtime hours, wherefore the overtime was authorized and approved within the meaning of the statute.
(b) Defendant contends that the overtime work was done voluntarily, wherefore it was neither authorized nor approved within the meaning of the statute and the regulations, since the administrative officers (district superintendents and their subordinates) lacked authority either to authorize or to approve it.
(c) The fair conclusion from the record as a whole is that the plaintiffs were induced to perform the overtime by the district superintendents and their subordinate officers, and that in providing such inducement the district superintendents acted under the leadership and upon the specific suggestion of the Commissioner of Customs.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Pule 38 (c).

 In addition to the Initial, standard orders of reference, an order issued on July 25, 1955, covering all of the cases in caption, directed (1) consolidation of the cases for trial and for briefing and argument; (2) severance of the issues, limiting the determination in the first instance to the right of the plaintiffs to recover; and (3) inclusion of the commissioner’s recommendations for conclusions of law with his determination of the facts.

 Some of the plaintiffs served from time to time as customs port inspectors, to whom the provisions of the Act of February 13, 1911, as amended (36 Stat. 901; 19 U. S. C. 267) apply. No claim is made in any of these suits for any such services.

 Act of June 30,1945, 59 Stat. 295.

 Although the personal representative of the claimant has been substituted on suggestion of death of the original plaintiff Broderick in case numbered 50303, and in case numbered 50367 the personal representative of claimant Trask was an original plaintiff, the word “plaintiff” as used in these findings refers to the patrol inspector who is (or was) the claimant, unless such meaning is clearly inappropriate.

 The Federal Employees Pay Act of 1945 became effective on July 1, 1945.

 The customs patrol service ceased to exist on July 24,1948.

 As to some (possibly all) of the claims, there may be a question of cut-off somewhere between July 1 and December 31, 1945, because of the six-year statute of limitations. Whatever questions of the kind there may be are immaterial to the present phase of the cases.

 Each district also had an Assistant Superintendent and a small administrative staff.

 The Southeast Patrol District was abolished on December 1, 1939. The evidence presented in these cases relates only to the Northwest and Southwest Districts. The parties have agreed, however, that the findings predicated on the evidence may also be accepted as controlling the Northeast District.

 In the administrative parlance of the patrol, the captain was known as the Company Commander.

 The Importance of receipts from customs in the history of public finance in the united States has been obscured in recent years by the search for revenues from sources other than customs duties. Although the Constitution restricts customs to imports (Art. I, Sec. 9), these taxes accounted for four-sevenths of the revenue of the united States during the first 90 years of the nation’s existence (down to 1880), and for 49 percent of the revenue as late as 1910. Prior to 1940 the all-time peak of customs collections was $605,-500,000, for the fiscal year ending June 30, 1927. Ten years later collections had fallen below $360,000,000, not far above the receipts for 1910.

 This fact is a footnote to the history of land travel on the North American continent. Vigilance for the protection of customs revenue began in 1790, when the 1st Congress made provision for the revenue cutter service. Several years passed before the United States Navy was organized. As the forerunner of today’s Coast Guard (established in 1915) the cutter service was charged with the prevention of smuggling from the sea. Since it also patrolled the Great Lakes and the St. Lawrence, the fact that a border patrol on land was not established until 1853 is evidence of how recent has been the development of land travel through the forests of the north and the deserts of the south.

 “The background of the Southwest Customs Patrol may be traced back in Border history almost one hundred years and involves the colorful and hazardous days of the Pioneers and Indians long before the coming of the railroads. * * *
“* * * It was during this period 11906 and after] that numbers of * * * Roosevelt’s ‘Rough Riders’ were appointed, as mounted inspectors, followed by numerous appointments of former Texas Rangers, ex-sheriffs and other peace officers who were known and respected for their knowledge of the Border and their able performance of duty.
“The Southwest Patrol today includes many officers of the old mounted organizations who can vividly recall Border lawlessness almost unknown in the present age. * * * Patrol inspectors, throughout the history of the Service, have distinguished themselves by their valor, loyalty, and devotion to duty.”
The foregoing statements were contained in material published by the Southwest Patrol in 1946 as part of a training course for patrol inspectors. A similar training course was conducted during the same year by the Northwest Patrol, and the material published by that district is also in evidence. Frequent use is made hereinafter of excerpts from these training course materials.

 “The Customs Patrol Inspector * * * is required * * * to patrol a designated area along tlie International boundary * * * by official automobile, motor toboggan, surf boat, cabin cruiser, outboard motorboat, canoe, on foot in swamp, timberland, across portages, and in mountainous areas, on horseback, or on snowshoes or skis, to detect and prevent smuggling * * From the Northwest Patrol Training Course of 1946.

 They were first blanketed into the civil service in 1894. The coverage was removed in 1906, and restored by the Executive Order of June 21, 1932.

 “The payroll title Patrol Inspector includes two groups of patrol officers. The Civil Service classifies them as: Customs Patrol Inspector (Journeyman) CAP-7 and Customs Patrol Inspector (Trainee) CAP-6. The CAP-7 group consists of older, experienced officers who have served their apprenticeship, so to speak, and are qualified also to take charge of a detail of officers. It is from this group that supervisory officials select the unit Readers or Car Men. Officers of the CAP-6 group are referred to as Junior Inspectors and they are the new officers in training status serving their first year on probation. * * *” Prom the Southwest Patrol Training Course.

 Tile Southwest Patrol Training Course (1946) described the position as follows: “The actual responsibility of patrolling the Border between ports of entry, of arresting violators of the tariff laws and seizing their merchandise, rests with the Patrol Inspector. He is the officer who is constantly on the job in his assigned border territory, alert and vigilant, day or night, in all hinds of weather, subject to a gun fight or a wild chase in a patrol car, and untiring in his efforts to enforce the Federal Daws which protect the rights of international trade and commerce. * * *”

 Tills was the primary technique of the Northwest Patrol, where the problem was to prevent the smuggling of produce, furs, and livestock past the ports of entry.

 Paid informers were the main reliance of the Southwest Patrol, where the most serious smuggling traffic was in narcotics and jewelry.

 “Enforcement of laws requires continued surveillance of activities of smugglers. Around-the-clock patrol coverage is required. Working hours must be staggered to cover all hours of the day — meal hours, early morning hours, daytime hours, hours during stormy weather, etc. There should be concentrated night patrol (coverage of one area during the same hours for a number of nights). Approximately 25 percent of a patrolman’s duty should cover the hours between 6 p. m. and midnight, another 25 percent * * * between midnight and 6 a. m., and the rest * * * between * * * 6 a. m. and 6 p. m. * * * The nature of patrol duties precludes the keeping of regular business hours.” Prom the Northwest Patrol Training Course, 1946.

 “A practical usage of the Mexican language is as necessary to the successful officer of the Southwest Customs Patrol as is his proficiency with firearms, his ability in horsemanship, or his knowledge of what constitutes a violation of the tariff laws.” Prom the Southwest Patrol Training Course, 1946.

 “The handling of informers, and information which comes to the Patrol through the medium of the former [sic], constitutes the greatest single factor in patrol activities. By far the great majority of seizures and apprehensions are accomplished as the result of previous information.” Prom the Northwest Customs Patrol Manual.

 The Customs Service paid them under special regulations permitting the use of assumed names.

 Elements considered especially important were underscored in accordance with the type of position and nature of the work.

 This element was further defined as: “Meeting schedules, time limits or deadlines — keeping current. Showing progress — getting along. Working speed. Keeping job moving.”

 “Promotions in the Patrol Service are based solely on efficiency, good conduct, and length of service. * * *
“Administrative officials who are authorized to make recommendations for promotions in grade and position take into consideration the recommendations of the immediate superior officers of the patrol inspector who is being con *378 sidered for promotion. .These immediate supervisory officers work and come in daily contact with the patrol inspectors and are well qualified to Judge their professional ability and to evaluate their general fitness for promotion.
“The efficient, intelligent patrol officer is always interested in a promotion. In this connection, it is suggested that the patrol officer look about him and analyze not only the accomplishments but also the attitudes of the various men who, from time to time, have been selected for advancement. The clock-watcher is seldom, if ever, moved upward. The individual with no initiative or ambition, who is satisfied to ‘put in time’ and do no more than is required, is not often selected for promotion. Neither is the officer who is jealously attempting to gain every scrap of credit for results obtained, to the exclusion of other participating officers. The man who is earnestly applying himself to his job, is amenable to discipline, is constantly alert, and who is constantly working in the interests of the government and the organization, is the man who is picked to fill the more responsible position.” From the Southwest Patrol Training Course, 1946.

 “The officer of the Customs Patrol Service has accepted a job with the intention of making it a life career. It is his desire to know his job well and to perform his duties intelligently. He becomes aware of the existence of a certain ‘esprit de corps’ within the Service and he feels justly proud in knowing that he is a part of it. He also realizes that in order to merit a part in this esteem, respect, and devotion, he must learn everything he can about the Customs Service and qualify himself to meet its standard of efficient, loyal, service.” From the Southwest Patrol Training Course, 1946.

 27 Stat. 675, 715.

 Act of March 15, 1898, 30 Stat. 277, 316.

 Act of March 3, 1931, 46 Stat. 1482.

 Section 601 of the Federal Employees Pay Act of 1945, 59 Stat. 295, 302, specified that: “The provisions of this Act shall not operate to prevent payment for overtime services or extra pay for Sunday or holiday wort in accordance with any of the following statutes: * * * Provided, That the overtime, Sunday, or holiday services covered by such payment shall not also form a basis for overtime or extra pay under this Act.” The statutes listed were: (1) the Act of February 13, 1911, 36 Stat. 901, relating to customs port inspectors; (2) the Act of July 24, 1919, 41 Stat. 241, relating to certain employees of the Bureau of Animal Industry of the Department of Agriculture; (3) the Act of June 17, 1930, 46 Stat. 715, amending the provisions relating to customs port inspectors; (4) the Act of March 2, 1931, 46 Stat. 1467, relating to immigrant inspectors; (5) the Act of May 27, 1936, 49 Stat. 1385, relating to employees of the Coast Guard and to certain customs port employees; (6) the Act of March 23, 1941, 55 Stat. 46, relating to radio inspectors employed by the Federal Communications Commission; and (7) the Act of June 3, 1944, 58 Stat. 269, further amending the provisions relating to customs port inspectors.

 “Prescribed for the Instruction and Guidance of Customs Officers.” Effective July 1, 1943.

 The same provisions were retained in the revision of the Manual in June 1944, with only a footnote explanation that: “As a war emergency measure the hours of service have been modified in various particulars for the war period.”

 Following is an excerpt from a letter circularized by tbe Bureau of Customs under date of January 2, 1942:
“In a very few instances Bureau Instructions concerning new activities connected with the defense program and the current war effort have not been put into effective operation with the excuse given that insufficient personnel is available.
“One instance of this kind is too many. It is a tradition of our Service that, in time of war or in time of peace, it can handle any task assigned to it. Such tasks may require reorganization of methods and procedures, temporary reassignments and misassignments of personnel, unusual demands upon the physical and mental reserves of individuals, and the performance of duties outside scheduled hours, but the tasks are accomplished. * * *”

 The practice was abandoned only when it became apparent to the Bureau that some, possibly all, of the non-reimbursable overtime was nevertheless compensable, under the decision of United States v. Myers, 320 U. S. 561; and that the choice lay between giving up the practice or seeking the appropriations necessary to continue it.

 For example, the Aet of Jane 28, 1940, 54 Stat. 67,6, established the “* * * regular working hours of the Navy Department and the Coast Guard and their field services * * *” as “eight hours a day or forty hours per week * * and authorised overtime pay for work in excess of 40 hours by certain classes of employees. Similarly, the Act of October 21, 1940, 54 Stat. 1205, established “* * * overtime rates for compensation for employees of the field services of the War Department, and the * * * Panama Canal * * To the same effect, see also the Act of June 3,1941, 55 Stat. 241.

 Act of June 28,1940, 54 Stat. 676.

 Joint Resolution of December 22, 1942, 56 Stat. 1068.

 Act of May 7, 1943, 57 Stat. 75.

 56 Stat. 1068.

 57 Stat. 75.

 59 Stat. 295.

 In the absence of statutory authorization for oyertime pay, Federal employees generally would have been required during the war to work 48 hours while being paid for a 40-hour week.

 See finding 8 (a).

 d.

 The overtime rates specified in section 201 (b) took cognizance of the 48-hour administrative workweek in effect during the war by providing “overtime rates of compensation per 416 overtime hours,” i. e., eight hours overtime per week for 52 weeks.

 This provision in the 1945 Act authorized' the use of lieu time only for work in excess of 48 hours. The 48-hour specification was changed to 40 hours by section 9 of the Federal Employees Pay Act of 1946, approved May 24,1946, 60 Stat. 216, 218.

 The effect of this order, at the time was to establish a 48-hour week, composed of five 8-hour days at basic compensation and one 8-hour day at overtime.

 10 F. U. 8191.

 Another, similar reference to patrol inspectors by way of exception to an exception left unanswered the question as to the place, if any, of patrol inspectors in the directive. The Southwest Patrol read it to mean that patrol inspectors were included. See subparagraph (c) of this finding.

 Excerpts from training course materials quoted in earlier footnotes:
“Patrol inspectors, throughout the history of the Service, have distinguished themselves for * * * devotion to duty.”
“He is the officer who is constantly on the job.”
“The nature of patrol duties precludes the keeping of regular business hours.”
“The clock-watcher is seldom, if ever, moved upward.”

 Bach customs patrol inspector was obligated by his oath of office to “well and faithfully discharge the duties of his office.”

 Rumblings among the men over the loss of former overtime pay were countered with these considerations: (1) that base salaries had been raised more than once in recent years; (2) that the service grade had been raised since July 1, 1945, from CAB-6 to CAB-7; and (S)i that the Bureau of Customs had under consideration a recommendation to Congress for a lump-sum payment for overtime to take the place of the requirements of the 1945 law, which, if enacted, would make it possible for the Patrol Service to pay the men for doing their jobs.

 Binding 11 (c).

 Binding 11 (e).

 Binding 14 (a).