**James E. DeCOSTA, Vinson D. Thomas, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 721–88C.**

United States Claims Court.

Dec. 7, 1990.

Daniel M. Katz, Washington, D.C., for plaintiffs. Ira M. Lechner, of counsel.

Christopher W. Dysart, with whom were Asst. Atty. Gen., Stuart M. Gerson, David M. Cohen, and Stephen J. McHale, Washington, D.C., for defendant. Major Joyce I. Spisak, Office of the Judge Advocate General, U.S. Air Force, of counsel.

## OPINION

BRUGGINK, Judge.

This is an action brought under certain provisions of the Federal Employees Pay Act ("FEPA"). 5 U.S.C. §§ 5542, 5545, 5546 (1988). As firefighters, plaintiffs presently receive standby premium pay in lieu of other types of premium pays. They contend that the amount of pay they would otherwise receive for different types of premium pay is greater than the standby premium pay they presently receive, and that therefore they should be getting those other premium pays, and not standby pay. Trial was held on the question of the amount of time during which plaintiffs regularly perform actual work in excess of an eight hour workday. This opinion deals only with that factual question and related legal issues. No determination is made as to liability.

### I. STATUTORY BASIS FOR THE PLAINTIFFS' CLAIMS

Premium pay is pay provided in addition to basic pay. Five different types of premium pay are authorized by 5 U.S.C. Ch. 55, Subchapter V and 5 C.F.R. Part 550, Subpart A (1990): 5 U.S.C. §§ 5542 (overtime), 5545(a) (nighttime work), 5546(a) (Sunday work), 5546(b) (holiday work), and 5545(c)(1) (standby pay). Standby premium pay is allowed in lieu of rather than in addition to the other premium pays. The statutory authorization for standby premium pay states in relevant part:

(c) The head of an agency, with the approval of the Office of Personnel Management may provide that—

(1) an employee in a position requiring him regularly to remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter.... Premium pay under this paragraph is determined as an appropriate percentage not in excess of 25 percent, of such part of the

rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10 ... by taking into consideration the number of hours of actual work required in the position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of the position are made onerous by night, Sunday, or holiday work, or by being extended over periods of more than 40 hours a week, and other relevant factors;

5 U.S.C. § 5545(c)(1).

The statute is expressed in regulatory terms at 5 C.F.R. § 550.141. That section provides in relevant part:

> An agency may pay premium pay on an annual basis, instead of the premium pay prescribed in this subpart for regularly scheduled overtime, night, holiday and Sunday work to an employee in a position requiring him to regularly remain at, or within the confines of his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work.

Pursuant to 5 C.F.R. § 550.142, an agency may pay standby premium pay under § 550.141 only if that pay, over a period of time sufficient to reflect the full cycle of an employee's duties and the full range of conditions in his position, would be more than the other particularized premium pays available for the hours of "actual work" excluding standby time when no actual work is performed, and would be less than premium pays for hours of duty including non-working standby time.[1]

Plaintiffs charge that the standby premium pay they receive pursuant to 5 U.S.C. § 5545(c)(1) and 5 C.F.R. § 550.141 is less than the premium pay they are entitled to under 5 U.S.C. §§ 5542, 5545(a), 5546(a) and 5546(b) and is therefore a violation of § 550.142. Defendant counters that § 550.142 is either

an invalid exercise of OPM's authority, or to the extent it is valid at all, it does not apply to firefighters. The first issue thus posed is whether the latter regulation applies to plaintiffs. For the reasons discussed below, the court concludes that plaintiffs are entitled to rely on that provision. The factual issue thus posed is how much "actual work" plaintiffs perform after their regular eight hour workday. If plaintiffs' compensation, based on that figure, is adjusted for night, Sunday, and holiday premiums, and is greater than the amount which they are currently compensated (regular pay plus standby premium pay), liability attaches. The court will not, at least initially, undertake to perform that calculation, however. In addition, once liability attaches, pay for overtime is based on "hours of work" officially ordered or approved, rather than "actual hours of work." *See* 5 U.S.C. § 5542(a). The court is presently unequipped to make that calculation as well.

## II. FACTUAL BACKGROUND

Plaintiff James E. DeCosta has been employed as a firefighter since 1975. DeCosta was promoted to the civilian position of Assistant Chief for Operations for Andrews Air Force Base ("AAFB") Fire Department on August 22, 1982. Currently, he executes his duties as Assistant Chief for the B shift at AAFB Fire Department. Plaintiff claims that he has been improperly compensated for this work since December 13, 1982 until the present.

Plaintiff Vinson D. Thomas has been employed by defendant as a firefighter since 1969. Thomas was promoted to Assistant Chief for Operations for AAFB Fire Department on November 27, 1983 and currently serves in this position for shift A of the Fire Department. Thomas claims he has been improperly compensated for the work he has done since his promotion to Assistant Chief until the present.

---

1. Actual work is defined by 5 C.F.R. § 550.143(e) in relevant part: "[a]n employee is performing actual work, rather than being in a standby status, when his full attention is devoted to his work.... Actual work includes both work performed during regular work periods and work performed when called out during periods ordinarily spent in standby status."

Both Assistant Chief DeCosta and Assistant Chief Thomas are at Grade 10 Step 7 on the General Schedule ("GS") and earn an annual basic rate of pay of $32,648. In addition to their annual rate of pay, plaintiffs have received from the date of their promotion to Assistant Chief "standby premium pay" in the amount of 25 percent of their rate of basic pay (calculated at a rate of GS-10 Step 1) pursuant to 5 U.S.C. § 5545(c)(1).

Plaintiffs work under the direction of the Fire Chief. The Chief's tour of duty is limited to a 40 hour week, Monday through Friday, although Chief Cook, plaintiffs' supervisor during recent years at issue, testified that he is normally at the station from 7:00 a.m. until 5 or 6:00 p.m. Plaintiffs, on the other hand, work alternating 24 hour shifts. From 7:30 to 4:00 they work a regular eight hour administrative workday. After that period ends, however, they are required to be on duty until 7:30 the next morning. After the Chief leaves for the day, either DeCosta or Thomas is the ranking senior officer on his shift in charge of all operations. Plaintiffs have been authorized by their supervisors, by Air Force Regulation ("AFR") 92-1, and by virtue of their personnel position description to take independent action in directing all phases of the fire protection mission in the absence of the Fire Chief.

The AAFB Fire Department consists of two fire stations. After 4:00 p.m., the plaintiffs are responsible for supervising the operation of both stations in order to provide fire protection, fire prevention and firefighting for all facilities under AAFB control. Each fire station has a Station Captain who reports directly to DeCosta or Thomas. The stations are referred to as "Station 1" and "Station 2." Both plaintiffs spend the majority of their time in Station 1 where their offices are located.

However, plaintiffs make daily visits to Station 2 since they are responsible for both stations while on duty.

Currently, plaintiffs work three alternating 24 hour shifts per week, resulting in a 72 hour tour of duty.[2] There is no question that, after their normal administrative workday, plaintiffs regularly perform a certain amount of additional actual work. The claims related to this work fall into various categories depending on the time of day or the nature of the work.

In addition to the anecdotal evidence of the witnesses, there were two types of more detailed information concerning the amount of time plaintiffs spend in various activities after 4:00 p.m. each day. The first are log books kept by each plaintiff at the instruction of counsel. Thomas' log covers his workdays for a two year period between June 2, 1988 and June 2, 1990. DeCosta's record keeping covered virtually the same period, but most of his logs were lost. In terms of asserting how much time they actually work, however, and the amount of time spent during nighttime hours (6:00 p.m. to 6:00 a.m.), plaintiffs rely on a much briefer period of time. Their calculations cover slightly more than two months between March and May 1990. Based on that data, Thomas claims that he regularly put in more than five hours of actual work beyond his regular eight hour day. DeCosta claims that he regularly works more than eight hours beyond his regular eight hour day.

The second type of detailed records are reflected in Station 1's official log book. The alarm room in Station 1 functions as the center for all incoming emergency calls. In addition to other duties of alarm room personnel (not plaintiffs), they are responsible for dispatching all vehicles from Station 1. The official log book keeps

2. From March 15, 1987 until September 29, 1988, plaintiffs worked a 60 hour workweek which was comprised of five 24 hour shifts in a two week pay period. DeCosta testified that he had a meeting with Fire Chief Fred Hill at the Vice Commander's office in July 1984 which resulted in this schedule change. DeCosta said that he filed a grievance with the Vice Commander concerning the excessive number of

hours he believed he was working. Plaintiff testified that he also went to Colonel Rogers, the Base Fire Marshall and Base Civil Engineer at Andrews, who attempted to lessen the work load by placing plaintiffs on a 60 hour workweek versus a 72 hour workweek. Plaintiffs were returned to a 72 hour workweek; however, no explanation is given for why this occurred.

a time record of all vehicle movements. It indicates time out of the station and back in again including any relevant information as to whether an Assistant Chief is out or what particular vehicle is out. This record is essential to effective operation of the Fire Station because firefighters must be able to locate the Assistant Chief or any fire truck in the event of an emergency.

The testimony of all witnesses was clear that plaintiffs spend some amount of time prior to 7:30 a.m. being briefed on the previous days activities by the off-going Assistant Chief and participating in a roll call. This briefing is performed in an effort to maintain a unified Fire Department in view of the fact that there are two distinct shifts which rarely if ever overlap. Since each Assistant Chief is at the Fire Station only every other day, it is necessary that each be aware of what happens to vehicles or personnel on his off day. He may receive calls during the day from civilian or military personnel concerning problems occurring on the alternate shift. Another reason for the morning briefings is that one shift of workers may begin a certain task in one manner, and the next shift will want to continue the task in a different fashion. Since both shifts are obliged to use the same equipment and in essence function as if they are one body these problems must be accommodated. Plaintiffs testified that the Fire Chief would often participate in the briefings.

Plaintiffs claim that these pre-shift briefings take place from 7:00 a.m. until 7:30 a.m. every morning. However, the evidence on the length of the briefings was equivocal. One witness put forward by plaintiffs corroborates this time frame, but this was an estimate by one firefighter, and the court was left with the impression that it was only intended as an imprecise guess.[3] Furthermore, DeCosta's and Thomas' personal logs often fail to record a pre-shift briefing or else record one lasting less than 30 minutes.[4] Fire Chief John Cook testified that he was aware plaintiffs were conducting a roll call and briefing, and indeed instructed them to do so. He arrives for work at approximately 7:00 a.m. and thus knew that roll call is conducted before commencement of the oncoming shift. He testified that it took 10 or 15 minutes and commenced sometime after 7:00 a.m.

After the pre-shift briefing, plaintiffs work a regular eight hour administrative day from 7:30 a.m. until 4:00 p.m. (one half hour for lunch), when standby time commences. Both plaintiffs testified that their regular workdays are inadequate to complete routine paperwork, such as evaluations, reports, and planning. They typically spend a significant portion of the day between 4:00 p.m. and 6:00 p.m. completing this paperwork. Chief Cook corroborated this to some extent. Plaintiffs eat supper for approximately one half hour, barring interruptions. Thereafter, they spend the evening, night, and early morning, until approximately 6:30 a.m., in various job responsibilities discussed below, in recreation, or in sleeping. From approximately 6:30 a.m. until 7:30 a.m., they are frequently engaged in paperwork, or the briefing and roll call discussed above.

During the time that plaintiffs are on standby duty, they are required to be prepared to perform a number of functions.

**3.** Rickey Rogers, the Lead Firefighter for AAFB on shift B under the supervision of plaintiff DeCosta, testified that the pre-shift briefings occur between 7:00 a.m. and 7:30 a.m. each morning. Thomas testified however that the pre-shift briefings occur "somewhere around 7:00, it may not be exactly at 7:00." Furthermore, he testified, "There's no set time on how long the briefing would take. It ranges." DeCosta testified, "This briefing may well take 20 minutes. Different days it would take a different amount of time."

**4.** The court averaged the times Thomas recorded in his personal log for pre-shift briefings.

The resulting average was 18 minutes per day. Thomas' log was used as representative of both plaintiffs since they engaged in the meetings together. The dates averaged were: September 22 and 26, 1988; October 6, 18, 20, and 24, 1988; November 1, 3, 7, 15, 17, 21, and 23, 1988; December 1, 1988; March 3, 14, 18, 26, and 28, 1990; April 17 and 27, 1990; and May 5, 1990.

Although Thomas did not record a pre-shift briefing in every entry in his personal log, the Court accepts the testimony that briefings and roll call were a daily occurrence.

The Assistant Chief has the primary responsibility after 4:00 p.m. to protect the base from fire. He often responds personally to medical and fire emergencies. When a trouble alarm goes off the Assistant Chief may not have to personally respond, but he gives orders as to what action should be taken. The Assistant Chief also performs other duties after 4:00 p.m. including completing telephone notification checklists and vehicle discrepancy lists.

An additional function concerns barrier inspections and visits to Station 2.[5] Inspection of runway barriers is a function primarily attended to during daytime hours by the Assistant Chief. These barriers are brake systems located at the end of runways which serve to stop an airplane in the event of an emergency landing. After the administrative day is over, the individuals who take care of all the arresting systems and the barrier functions on the two active runways are relieved of duty. Fire Department Regulations stipulate that the department will support the function of barrier maintenance and inspection after 4:00 p.m. and on weekends. Chief Fred Hill recommended to Thomas that all barrier inspections be done in the evening and in conjunction with a visit to Station 2.

Training can also take place after regular work hours. In the event of Fire Department error, the department must be able to document that firefighters have been properly trained. AFR 92–1 states that training on all 20 different types of aircraft native to AAFB must be performed at night as well as during the daytime. Some training is also required on aircraft which merely visit Andrews. Plaintiffs are responsible for organizing and overseeing night training activities.

This requires plaintiffs to request an aircraft and then prepare it to simulate an emergency situation. Firefighters are required to board the aircraft, shut it down, and remove all simulated passengers. This is followed by a performance critique led by the Assistant Chief. Subsequent to these activities, the Assistant Chief must fill out training reports on the night's activities.

Plaintiffs also contend that the time they spend counseling the approximately 30 firefighters who work under each Assistant Chief is "actual work." Thomas testified that he defined counseling as sitting down with his personnel to talk about their problems. DeCosta emphasized that he felt it was his duty to talk to firefighters about personal matters because they might affect work performance. During trial, the parties attempted to develop an exhibit showing the amount of time plaintiffs typically spend in such activities. It reflects that about 30 minutes per day is spent in counseling.[6]

### III.  DISCUSSION

#### A.  Section 550.142

■ 5 C.F.R. § 550.142 is clearly a limitation upon the circumstances in which an agency may pay standby premium pay in lieu of other premium pays. Defendant contends that OPM exceeded the scope of the authority granted by 5 U.S.C. § 5542 in adopting that regulation at all, but particularly insofar as it is not limited to workers other than firefighters.[7]

Standby premium pay is not automatic, even for firefighters. Heads of agencies and OPM *may* approve standby premium pay. *See* 5 U.S.C. § 5545(c)(1). Congress

---

**5.**  Thomas testified that past and present supervisors have been adamant in stressing that Station 2 should not be neglected because after 4:00 p.m. the Assistant Chief is the senior fire official responsible for all activities of the Fire Department.

**6.**  During trial, plaintiff and defendant took a representative period of time from March 4, 1990 until April 27, 1990 comprised of 16 days on which they agreed counseling occurred. After averaging the amount of time spent counseling on these days, the court finds the number to

be approximately 28 minutes a day which plaintiffs and defendant agreed upon as being counseling time.

**7.**  The court notes that in *Abreu, et al. v. United States,* Nos. 574–88C, 661–88C, 695–88C, 95–89C (Claims Court), currently pending before the court, the Government has, in briefing in support of its motion for summary judgment, relied on the validity of 5 C.F.R. § 550.142. *See* Brief of May 25, 1990, p. 17.

authorized OPM to determine the conditions in which standby premium pay could be awarded in lieu of other premium pays. The standby premium pay provision specifically instructs the agency and OPM to take,

> into consideration the number of hours of actual work required in the position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of the position are made more onerous by night, Sunday, or holiday work, or by being extended over periods of more than 40 hours a week, and other relevant factors.

*Id.* The purpose of suggesting this evaluation of hours is clearly to peg the standby premium percentage as closely as possible to the equivalent pay under other premiums. Section 5545(c)(1) contemplates, therefore, that some amount of judgment and oversight would vest in OPM to ensure equity. OPM has chosen to implement judgment in a way that creates parameters within which standby premium pay must fall.

Defendant's real complaint is that the lower parameter ensures that an employee cannot be penalized through use of standby pay. In its starkest form, defendant's argument is that even if the cumulative pay for all additional hours otherwise subject to premium pays would far exceed 25 percent of base pay (calculated at a lower step than plaintiffs actually earn), an employee would nonetheless be limited to the 25 percent standby pay. Plainly the statute does not prevent OPM from exercising discretion to avoid that result.

Defendant argues that Congress' real intention, expressed in the legislative history, was that firefighters are only to receive standby premium pay, regardless of what they would be entitled to in other premiums. It relies on the following language in a House Conference Report that addresses changes made in various bills leading up to the adoption of § 5545(c)(1) in its present form (in substance). The highlighting is drawn from defendant's brief.

Section 401(b) of the new Title IV as contained in the Senate amendment and S. 2665, as reported to the House, provided that the new Title IV shall not apply to fire-fighting personnel. The Senate amendment and S. 2665, as reported to the House, thus excluded fire fighters from those categories of personnel who would be eligible to receive up to 25 percent additional annual pay in lieu of other premium compensation for long periods of standby duty. As a result, fire fighters would have continued to be paid overtime, night, and holiday duty under provisions (other than the new Title IV) of the Federal Employees Pay Act of 1945, as amended, which relate to such duty. *This provision was included in the Senate Amendment and S. 2665, as reported to the House, in order to prevent a reduction in compensation for a number of firefighters now in service who are receiving more than 25 percent additional pay by virtue of overtime, holiday and night differential now authorized.*

The conference substitute changes these provisions of the Senate amendment and S. 2665, as reported to the House, by providing that the new Title IV shall apply to fire fighters. *For the future, the committee of conference agreed that new fire-fighting employees should receive up to 25 percent additional annual compensation in lieu of other premium compensation for their long periods of standby duty, in order to avoid the complexities which arise in attempting to determine premium compensation for night, overtime, and holiday work caused by long periods of standby duty frequently performed by fire-fighting personnel.* The committee of conference further agreed, however, that the pay of those fire fighters now in the service who receive more than 25 percent additional pay provided by the conference substitute should not be reduced. This is accomplished by section 208(b) of the conference substitute which provides that the provisions of the new Title IV added by section 208(a) of the conference substitute to the Federal Em-

ployees Pay Act of 1945, as amended, shall not be construed to decrease the existing aggregate ratio compensation of any present employee. *If, however, the position of such present employee should become vacant in the future, any subsequent appointee to such position will receive premium compensation for such position in accordance with the provision of such new Title IV.* H.R.Conf.Rep. No. 2665, 83d Cong., 2d Sess. 11 (1954), *reprinted in,* 1954 U.S. Code Cong. & Admin.News 3816, 3871. From this language, defendant concludes that Congress clearly foresaw that firefighters not grandfathered in under section 208(b)[8] could receive standby premium pay in an amount that would be less than other premium pays. The reason Congress was willing for this potential disparity to exist, defendant asserts, is that its primary goal was to reduce paperwork and payroll accounting, and incidentally, to limit what it perceived to be overpayments in some instances. Defendant is certainly correct that easing the administrative burden of keeping a daily accounting of premium pay hours was the primary motivation behind the provision. As the Court of Claims wrote in *Bean v. United States,* 146 Ct.Cl. 267, 271, 175 F.Supp. 166, 168 (1959), Congress' "intention was to simplify the computation of the pay of employees required to remain in a standby status and to work overtime at night and on holidays." *See also* S.Rep. No. 1190, 83d Cong., 2d Sess. 16 (1954). It is a major leap, however, to draw from this language an expectation that firefighters would be limited to standby pay regardless of what their actual hours are.

Efficiency of administration was not the only consideration that Congress brought to bear. More generally, Congress expressed a concern that the proposed standby premium pay "would be easy to administer, fair to the government, and equitable for the employees covered." S.Rep. No. 1992, 83d Cong., 2d Sess. 18 (1954). Thus not only was Congress interested in promoting administrative convenience, but it was also concerned that neither the Government nor employees would be treated unfairly. There is no suggestion that convenience was to be at the expense of accuracy or equity.

Plaintiffs point out that § 550.142 was adopted almost immediately after passage of the FEPA Amendments of 1954. 19 Fed.Reg. 7095, 7100 (1954), codified at 5 C.F.R. § 25.252 (1955), recodified at 5 C.F.R. § 550.142 (1964). That provision has not been substantively altered in 35 years.[9] It is well settled that courts should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Nor is it necessary that the agency's "construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Id.* (quoting *Unemployment Compensation Comm'n v. Aragan,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)). *See also Red Lion Broadcasting Co. v. Federal Communications Comm'n,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). The Federal Circuit has also admonished that "the longstanding interpretation placed on a statute by the agency charged with its administration should be followed unless there are compelling reasons that it is wrong." *Money v. OPM,* 811 F.2d 1474, 1477 (Fed. Cir.1987); *see also Young v. Community Nutrition Inst.,* 476 U.S. 974, 980–81, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986); *Horner v. Andrzjewski,* 811 F.2d 571, 574 (Fed.Cir.1987), *cert. denied,* 484 U.S. 912, 108 S.Ct. 257, 98 L.Ed.2d 215 (1987). Although these general principles could not justify a regulation plainly beyond the au-

---

8. Within section 208(a) as originally adopted, 68 Stat. 1105, 1111 (1954), was a proviso that protected existing employees from a decrease in salary. That language has been eliminated and plaintiffs do not rely on it.

9. When the statute was recodified, the regulation was, without explanation, rewritten as a limitation on discretion rather than in affirmative terms. *See* 33 Fed.Reg. 10,954 (1963). *Compare* 5 C.F.R. § 550.142 (1964) *with* 5 C.F.R. § 550.142 (1963).

thority granted by the statute, that is not the case here.

Defendant points to decisions of the Court of Claims as inconsistent both with plaintiffs' position here and § 550.142. In *Bean*, 146 Ct.Cl. at 267, 175 F.Supp. at 166, plaintiffs had been receiving standby premium pay under § 5545(c)(1). They were among the employees potentially protected by the pay-savings provision referred to above. After the FEPA audits of 1954, their hours of duty increased, and they sought to have their new schedules compensated under the prior law, in reliance on the pay-savings clause. The court rejected that contention holding that the savings clause was limited to protecting compensation levels previously attained. Plaintiffs had not been receiving the higher pay they sought so the clause had no application. In its discussion the court writes:

> [Plaintiffs] say Congress intended to compensate them after the passage of the 1954 Act according to its terms only if they would get more under this Act than under the former Act.
>
> This plainly was not the intention of Congress. Its intention was to simplify the computation of the pay of employees required to remain in a standby status and to work overtime at night and on holidays.... No longer would it be necessary to keep an account of overtime and holiday and night-time work; no longer would there be uncertainty about their right to compensation for time spent in a standby status. This was the purpose of the Act.

*Id.* 146 Ct.Cl. at 271, 175 F.Supp. 166.

The narrow holding of *Bean* is that the plaintiffs there were not entitled by the pay-savings clause to revert to their old pay rates. While the language quoted above tends to support defendant's argument, it has to be recognized that the present issue was not before the court. Moreover, the predecessor provision to § 550.142 was already in existence and was the controlling regulation with respect to limiting standby premium pay.

It is also noteworthy that defendant's reliance on the language in *Bean*—"it was not the intention of Congress to increase the pay of firefighters"[10]—begs the question, are plaintiffs here seeking an increase in pay? The answer to that is clearly no, unless, as defendant of necessity implies, it was the intent of Congress to decrease their pay. Plaintiffs are by statute entitled to certain premium pays—overtime, holiday, standby and nighttime. Their reliance on those statutory entitlements cannot be called a request for an "increase" in pay in the context meant by Congress at the time of enactment of the 1954 amendments, or by the court in *Bean*.

Defendant's reliance on *Burich v. United States*, 177 Ct.Cl. 139, 366 F.2d 984 (1966), *cert. denied*, 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182 (1967), and *Fix v. United States*, 177 Ct.Cl. 369, 368 F.2d 609 (1966), is also inapposite. Both involved the companion provision to section 5545(c)(1), section 5545(c)(2), which relates to administratively uncontrollable overtime. As defendant points out, both subsections contain the language, "an employee ... shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter." Both are predicated, however, on an agency's decision, with OPM approval, to permit the alternate premium pay under those provisions. Neither *Burich* nor *Fix* dealt with the regulatory regime set up with regard to standby premium pay. The question thus remains whether the regulation adopted to implement standby premium pay "clearly contradicted the terms or purpose of the statute." *Fix*, 177 Ct.Cl. at 377, 368 F.2d at 614.

It is obvious that the use of standby premium pay requires an approximation of premium pays otherwise due. Of necessity this means that either the employee or the Government comes out on the short end. Because the primary purpose of the standby premium pay option was to simplify administration, it was not unreasonable for OPM to prevent use of standby pay when the employee would be penalized. While

**10.** *Id.* 146 Ct.Cl. at 271, 175 F.Supp. 166.

OPM might have developed a different regulatory mechanism, the one created is not unauthorized.

Finally, the court sees no reason to limit the application of § 550.142 to non-firefighters. Nothing in the underlying statute or the regulations supports such a limitation. As this court noted in *Manning v. United States*, 10 Cl.Ct. 651, 660 (1986), firefighting seems to have been the primary occupation that prompted Congress to act in 1954. If § 550.142 is valid at all, it would be applicable to firefighters.

### B. Section 5542

■ Plaintiffs contend that they can overcome the burden of showing they were improperly compensated by proving that the hours worked over eight hours a day entitle them to overtime compensation pursuant to 5 U.S.C. § 5542(a). That section provides in relevant part:

> For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or (with the exception of ... an employee whose basic pay exceeds the minimum rate for GS–10 for whom the first 40 hours of duty in an administrative workweek is the basic workweek) in excess of 8 hours in a day.

Under this provision, most employees are entitled to overtime pay if their work exceeds either eight hours per day or 40 hours per week. Defendant contends that plaintiffs fall within the exception for those employees "for whom the first 40 hours of duty in an administrative workweek is the basic workweek." It argues that plaintiffs are therefore only entitled to overtime pay for hours worked in excess of 40 hours per week. The court disagrees.

The question is whether the first 40 hours of duty in a week are plaintiffs' administrative workweek. Plaintiffs are scheduled to work a 72 hour tour of duty each week. AFR 40–610 reconciles the administrative workweek with the tour of duty by noting that "workweek" and "weekly tour of duty" are used to denote the same concept. Taking AFR 40–610 into consideration, it is clear that a 72 hour basic workweek does not fall into the exception § 5542 creates. The first 40 hours of each plaintiff's tour of duty consist of 24 hours on the first day of duty, and 16 hours out the next day of duty. This is not a 40 hour "basic workweek" within the meaning of the statute. As plaintiffs suggest, it would appear that the exception in the statute contemplated those employees who work a flexible schedule, such as four ten hour days.[11] In addition AFR 40–610 adds that "the basic weekly tour of duty for fire chiefs, assistant fire chiefs, fire prevention inspectors, and similar fire protection personnel is a 40–hour workweek of five 8–hour days *unless the duties of the position require substantial amounts of standby time.*" (Emphasis added.) Plaintiffs' position clearly did require substantial amounts of standby time.[12]

### C. Application

■ Plaintiffs calculate that on the average Thomas does actual work for five hours and 31 minutes after 4:00 p.m. and DeCosta does actual work for eight hours and eight minutes each day after 4:00 p.m. However, plaintiffs testified that they did substantially the same work. Thomas attempted to explain this substantial time difference recorded on the two personal logs by saying that DeCosta was more meticulous in the performance of his duties than himself.[13] The court does not agree.

---

11. The legislative history suggests that § 5542 was intended to preclude overtime pay for "employees who do not have a regularly established 5 day workweek but who also do not work more than 40 hours per week." S.Rep. No. 1187, 89th Cong., 2d Sess. 2 (1966), *reprinted in* 1966 U.S. Code Cong. & Admin.News 2495, 2496. Without the exception, for example, a worker with a four day, ten hour schedule would collect four hours of overtime for working twelve hours on a given day, even if the employee did no other work that week.

12. Defendant's reliance on FPM Supplement 990–2 Subchapter 1–3, 550–14(c)(2) is inapposite. That provision is directed only to prevailing rate or wage board employees.

13. DeCosta also testified that he had personnel problems unique to his shift. These were temporary in nature, however, and should not be

In fact, significant and repetitive discrepancies between the official log and DeCosta's personal log indicate that, in fact, DeCosta was far less meticulous about recording his actual hours worked after 4:00 p.m.[14] DeCosta testified that he rounded the times he worked at particular tasks to the half hour or hour. The court finds that he performed this operation liberally in his favor, and therefore, his personal log is unreliable as an accurate measure of the time he did work after 4:00 p.m.[15] On the other hand, there is no reason to believe that DeCosta would have less work to perform than Thomas as they have the same job descriptions. Furthermore, Fire Chief Cook, who supervises both plaintiffs, believes that both have performed their jobs well and adequately. Both Assistant Chiefs have consistently received annual performance appraisal ratings of excellent and superior. In light of these circumstances, the court finds that while DeCosta's stated overtime of over eight hours cannot be substantiated, it is also true that there is no reason to believe he worked any less than Thomas. Thus, in order to determine the number of hours that plaintiffs worked past the administrative workday, this court relies on Thomas' log as more accurate and representative of the work performed by both plaintiffs.

Defendant argues that it is inappropriate to place any reliance on the plaintiffs' personal logs because they were prepared after commencement of the litigation and are obviously self-serving. As discussed above, the court chooses to rely on Thomas' log. Although it was prepared in anticipation of trial, the court declines to reject it outright for that reason. Plaintiffs are not required as part of their work to keep personal logs, and therefore, any such records, whether before or after filing a complaint, would be subject to the same criticism. In this case, however, the court found Thomas to be a candid, credible witness. Moreover, there is a remarkable degree of exact correlation between the official "out of station" logs and Thomas' records.

The court also had before it the official log. Although there were minor discrepancies, the court was impressed with its general reliability. The court only has portions of the official log, however, and insufficient excerpts to match the two years of personal logs kept by Thomas. In addition, the official logs can only be used to verify time spent away from Station 1. It cannot be used to assess time within the station, except circumstantially.

The regulation in question permits standby to be paid only after a comparison with

used in assessing the amount of actual work plaintiffs did after the administrative workday as they do not reflect normal working conditions.

14. Plaintiffs submitted factual stipulations to the court reflecting agreed upon proposed findings of fact. Stipulation 27 states: "Both Plaintiff Thomas and DeCosta spend time playing cards, playing volleyball, talking about personal subjects unrelated to the functions of the Fire Department or Andrews Air Force Base, and similar activities during their 24 hour tours of duty."

Contrary to this factual stipulation, DeCosta testified that unless he was eating or sleeping, he worked around the clock taking no other personal time. DeCosta's logs do not show any break in work for leisure activities even though plaintiffs' factual stipulations specifically recognize that DeCosta engages in leisure activities. Furthermore, DeCosta testified that he played cards only once or twice every six months. Yet, John D. Abney, an alarm room communications operator in the Air Force who has worked on

both shifts equally for 2½ years, testified that excluding the last two months, DeCosta played cards one or two times weekly for several hours at a time. This testimony coupled with plaintiffs' own factual stipulations discredits DeCosta's personal log.

15. Examples of discrepancies between DeCosta's log and the official log include:

June 1, 1988 where DeCosta's log recorded a solid block of time from 1800 hours until 2400 in which he was away from the station doing a barrier check and responding to a structural fire. The official log only shows DeCosta absent from the station from 1826 until 1923. DeCosta attempted to explain the discrepancy by saying he must have been doing paperwork about the fire but could not specifically remember it.

March 11, 1990 the official log shows DeCosta as absent from the station for approximately two hours while his personal log shows him absent from the station for approximately five hours.

other premium pays over a "full cycle of the employee's duties and the full range of conditions in his position." 5 C.F.R. § 550.142. Although plaintiffs' calculations reflect a two month period, the court believes it would be more accurate to look at a longer span. In addition, because of the undisputed objectivity of the official log, the court will look to that log for the amount of time it took to perform the Station 2 inspections and the barrier checks if there were any discrepancies between Thomas' personal log and the official log.[16]

The court was able to isolate 25 days during which Thomas worked between June 1988 and March 1990 for which official log book entries are available. These are the entries utilized by the court in compiling actual hours of work performed by plaintiffs. Based on plaintiffs' testimony, this period of time is reflective of a full cycle of all their job responsibilities and conditions. The court finds that the actual amount of work performed by plaintiffs after 4:00 p.m. to be four hours and 55 minutes and the amount of time spent in pre-shift briefings to be 15 minutes [17] for a total overtime worked of five hours and 10 minutes.

The final issue which the court can address is whether the actual work asserted was officially ordered or approved, as required by § 5542(a).[18] In *Anderson v. United States*, 136 Ct.Cl. 365 (1956), the Court of Claims held that overtime did not have to be approved in writing to meet the statutory test. *Id.* at 370–71. In that case, knowledge by management of what was "induced," if not required, was sufficient to constitute approval. *Id.* In addition, the Court of Claims has looked to the nature of the employee's job to determine the degree of formality of the approval required. *Adams v. United States*, 162 Ct.Cl. 766 (1963). In that case the plaintiffs' position as border guards required frequent but unpredictable overtime. The court for that reason ignored certain requirements for advance approval of overtime. *Id.* at 770. While "tacit expectations" are not sufficient, *Rapp v. United States*, 167 Ct.Cl. 852, 862, 340 F.2d 635, 641 (1964), an expressed expectation that work will be performed is. *Id.* at 863, 340 F.2d at 641. Similarly, this court held in *Manning*, 10 Cl.Ct. at 651, that if an employee, with knowledge of supervisors, is placed in a position that, to fulfill his job responsibilities he must work overtime, the overtime is performed with approval. *Id.* at 663–64.

In the case at bar, plaintiffs' work schedule and the use of standby pay reflect a knowledge by management that job related duties may be performed after regular hours. Plaintiffs are on standby for a reason—to perform certain emergency firefighting functions. As to those functions, such as responding to alarms or supervising fire suppression, there can be no doubt that plaintiffs' work was ordered and approved. The uncontradicted testimony also reflects that plaintiffs were specifically ordered to perform barrier checks, training, and visits to Station 2 during evening and night hours. The circumstances of plaintiffs with respect to these duties are much like those of the tax agents in *Byrnes v. United States*, 163 Ct.Cl. 167, 176, 330 F.2d 986, 990 (1964), of whom the court wrote:

---

16. No explanation was given as to why extra work was required in Station 1 once the Assistant Chief was back in the station. Time discrepancies concerning emergencies or trouble alarms are understandable. Once back in the station there would be paperwork to fill out. The same would not be true of routine barrier checks.

17. The court calculated the time shown for pre-shift briefings by using the same log entries used to calculate the time worked after 4:00 p.m. However, the court did not include any days for which there was no pre-shift briefing recorded in Thomas' log book as Thomas testified that on some days he failed to record the briefing. Thus, pre-shift briefings were calculated by taking the shifts where briefings were recorded and determining an approximate average. This figure was reduced slightly in light of the testimony. This amount of time is not *de minimis*. *See Riggs v. United States*, 21 Cl.Ct. 664 (1990).

18. 5 U.S.C. § 5542(a) provides in relevant part: "For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or ... in excess of 8 hours in a day, performed by an employee are overtime work...."

"Had plaintiffs confined themselves to a rigid 40–hour week in the face of the clear inducement and compulsion exerted by their superiors to require overtime work, they would have been derelict in the performance of their sworn duties...."

DeCosta also testified that he told Chief Hill in 1984 that he was working as much as 14 hours a day. Thomas testified that he told the Fire Chief he was working more overtime than he was being compensated for in standby pay. These complaints were the subject of an informal grievance. In connection with that grievance, plaintiffs wrote a letter to Chief Cook in October 1988 stating that they were unable to complete their normal responsibilities during the eight hour administrative day. As to paperwork and reports, the evidence shows that Chief Cook was aware that plaintiffs were performing such activities between 4:00 and 6:00 p.m. most days. Plaintiffs testified that they told Cook's predecessor, Chief Hill, they were performing substantial duties after regular hours. Though Hill was listed as a witness by the defendant, he was not called to testify. Plaintiffs both testified that they could not complete their regular administrative and paperwork duties between 7:30 a.m. and 4:00 p.m. Some of these obligations flowed directly from emergency duties and training that took place after regular hours. The court concludes that the Air Force knew and approved of these activities.

The court notes finally that Chiefs Hill and Cook often participated in the morning briefings. Both Hill and Cook arrived at the station by 7:00 a.m. This demonstrates not only that the briefings were approved but the subjects discussed of necessity gave the Chiefs knowledge of the previous night's activities.

As to personal counseling, however, the evidence put forth by plaintiffs does not demonstrate that such activities were officially ordered and approved. Thomas testified that upon his promotion to Assistant Chief, Fire Chief Hill told him to "take care of your number one resource—your people. Listen to them." Thomas appears to have interpreted Chief Hill's statement to re-

quire personal counseling of employees. Thomas further testified that Chief Hill was aware of evening conversations between Thomas and a particular employee and would inquire as to how that employee was doing. The court finds that these conversations and this general awareness are too vague to definitively show that plaintiff was ordered, as part of his job, to counsel individuals. Counseling by its very nature is sufficiently removed from plaintiffs' enumerated job responsibilities that the court will not assume that Chief Hill understood that Thomas expected to be compensated for such activities. Accordingly, the amount of time reflected in the court's calculations is to be reduced by 30 minutes. The total amount of actual work established is four hours and 40 minutes.

In order to determine whether the amount of actual work done by plaintiffs precludes use of standby pay, there must be a finding with respect to the amount of actual work that occurs between the hours of 6:00 p.m. and 6:00 a.m., in order to calculate the hours subject to nighttime differential pay. 5 U.S.C. § 5545(a). Based on plaintiffs' and Chief Cook's testimony, a substantial portion of the time between 4:00 p.m. and 6:00 p.m. and 6:00 a.m. and 7:00 a.m. is regularly taken up with administrative duties and paperwork. The court has previously found that briefing and roll call takes 15 minutes. Consequently, the court finds that of the total actual hours worked, two hours were not within the nighttime pay differential period, and that the balance were.

## IV. CONCLUSION

DeCosta has performed actual work beyond eight hours per day in an average amount of four hours and 40 minutes between December 13, 1982 and the present. Thomas has performed actual work beyond eight hours per day in an average amount of four hours and 40 minutes between November 27, 1983 and the present. The parties are directed to evaluate the impact of these findings on the plaintiffs' eligibility for nighttime, overtime, Sunday, or holiday premium pay and attempt to reach and file

by January 10, 1991 a stipulation as to whether plaintiffs are entitled to recover, and if so, the amount of the recovery.