John DOE, on behalf of himself and all others similarly situated, Plaintiffs–Appellees,

v.

UNITED STATES, Defendant–Appellant.

No. 03–5075.

United States Court of Appeals, Federal Circuit.

DECIDED: June 23, 2004.

Robert A. Van Kirk, Williams & Connolly LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were Brendan V. Sullivan, Jr., John G. Kester, and Daniel D. Williams. Of counsel on the brief were Steven M. Umin, J. Alan Galbraith, David S. Blatt, and R. Hackney Wiegmann. Also of counsel on the brief were Paul Y. Kiyonaga and Debra L. Soltis, Kiyonaga & Soltis, P.C., of Washington, DC. Of counsel was Brad Snyder, Williams & Connolly LLP, of Washington, DC.

Mark B. Stern, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General; Gregory G. Katsas, Deputy Assistant Attorney General; Michael S. Raab, Alisa B. Klein, and Ara B. Gershengorn, Attorneys. Also on the brief was Hillary A. Stern, Attorney, Commercial Litigation Branch, Civil Division, of Washington, DC. Of counsel was Lewis Yelin, Attorney, Appellate Staff, Civil Division, of Washington, DC.

Before RADER, BRYSON, and DYK, Circuit Judges.

DYK, Circuit Judge.

Department of Justice ("DOJ") attorneys brought a class action lawsuit in the

Court of Federal Claims seeking overtime compensation. The Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5542 (2000), provides for such compensation only when overtime has been "officially ordered or approved." *Id.* § 5542(a). The relevant Office of Personnel Management ("OPM") regulation requires that overtime be officially "ordered or approved ... in writing." 5 C.F.R. § 550.111(c) (2004). Because the overtime here was not officially ordered or approved in writing as required by the regulation, we hold that the plaintiffs were not entitled to compensation under FEPA; reverse the Court of Federal Claims' grant of summary judgment in the plaintiffs' favor, *see Doe v. United States,* 54 Fed.Cl. 404 (2002) ("*Doe I* "); and hold that summary judgment should have been granted in favor of the government.

## BACKGROUND

The facts of this case are straightforward and uncontested. The plaintiffs (appellees in this court) are representatives of a class of more than nine thousand former and current DOJ attorneys who brought suit in the Court of Federal Claims in 1998, claiming compensation under FEPA for overtime work performed from 1992 to the date of a final judgment in this case. The Court of Federal Claims granted class certification in 1999. *Doe v. United States,* No. 98–896 C (Fed.Cl. Aug. 27, 1999) ("*Doe II* ").[1]

Following discovery, the parties brought cross-motions for summary judgment on the issue of liability in 2000. The plaintiffs submitted a variety of documents on summary judgment in support of their claim that overtime was "officially ordered or approved." The plaintiffs submitted the deposition transcripts of former Assistant Attorney General Stephen R. Colgate, in which he confirmed "that component heads expect their attorneys if necessary to put in the extra hours to get the job done," (J.A. at 538), and that "it has been the culture of the Department of Justice that attorneys are to put in the hours necessary to get the job done, and if that requires extra hours they are to put those hours in to get the job done," (J.A. at 539–40). The plaintiffs particularly emphasized excerpts from various editions of the United States Attorney's Manual spanning 1984 to 2000, which stated that "Assistant United States Attorneys are professionals and should expect to work in excess of regular hours without overtime premium pay." (J.A. 405–07, 410, 412; *see also* J.A. at 414, 416,

---

1. In 1999 Congress enacted a statute prohibiting the payment of overtime compensation to attorneys in any division of the DOJ for work performed subsequent to the enactment of the legislation:

> None of the funds made available by this or any other Act may be used to pay premium pay under title 5, United States Code, sections 5542–5549, to any individual employed as an attorney, including an Assistant United States Attorney, in the Department of Justice for any work performed on or after the date of the enactment of this Act [Nov. 29, 1999].
>     ... Notwithstanding any other provision of law, neither the United States nor any

individual or entity acting on its behalf shall be liable for premium pay under title 5, United States Code, sections 5542–5549, for any work performed on or after the date of the enactment of this Act [Nov. 29, 1999] by any individual employed as an attorney in the Department of Justice, including an Assistant United States Attorney.

Department of Justice Appropriations Act, 2000, Pub.L. No. 106–113, § 1000(a)(1), 113 Stat. 1501, 1535, 1501A–21 (1999). Therefore, the relevant period for purposes of this litigation is 1992–1999.

418.) [2]

It was undisputed that at least some members of the class at some times worked more than a forty-hour workweek. The parties differed as to the interpretation of the statute and the interpretation and effect of the pertinent OPM regulation. FEPA generally mandates overtime compensation to federal employees in Grade 15 or below for "hours of work officially ordered or approved in excess of 40 hours in an administrative workweek." 5 U.S.C. § 5542(a). The government argued that the plaintiffs were not entitled to compensation because the pertinent regulation required that overtime be "ordered or approved ... in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c). The government maintained that the requirement of a writing was not satisfied. The plaintiffs contended that "because [the DOJ] expected, encouraged, or induced plaintiffs to work substantial amounts of overtime and had knowledge that plaintiffs work substantial amounts of overtime, they have authorized and ap-

proved the overtime under 5 U.S.C. § 5542." (Compl. at ¶ 65.)

The Court of Federal Claims held in favor of the plaintiffs, granting the plaintiffs' summary judgment motion and denying the government's motion. *Doe I,* 54 Fed.Cl. at 418. The Court of Federal Claims found that "[n]o plaintiff in the Class has requested overtime, and it follows that no authorized official could have ordered or approved it" in writing. *Id.* at 409. The court further explained that the "[p]laintiffs do not allege that they were explicitly ordered to work overtime by an authorized official, but that management's expectations and their caseloads require work in excess of forty hours a week to complete [sic] satisfactorily." *Id.* at 406. The court recognized that until the 1956 decision in *Anderson v. United States,* 136 Ct.Cl. 365, 1956 WL 8341 (1956), our predecessor court, the Court of Claims, had strictly enforced the OPM regulation's requirement that an order or approval for overtime be made in writing. However, the court concluded that the Court of Claims adopted "a more equitable ap-

---

**2.** The record also includes various internal DOJ memoranda summarizing the statutory and regulatory framework governing attorney overtime work, including: a 1980 memorandum from a Deputy Assistant Attorney General to an Associate Attorney General warning that "the court is likely to conclude that much overtime performed by attorneys, especially work required to meet short deadlines, has been 'induced,'" (J.A. at 424); a 1984 memorandum from an attorney in the Commercial Litigation Branch to [a] Deputy Assistant Attorney General stating, in "response to a request for an opinion as to whether attorneys are entitled to overtime pay ... [that] an attorney employed by the Civil Division is entitled to overtime pay," (J.A. at 427, 432); a 1984 memorandum from the Deputy Director of the Office of Attorney Personnel Management to the Director, explaining that "[t]he bottom line is that title 5 of the United States Code entitles DOJ attorneys ... to

overtime pay or compensatory time ... for all overtime ordered, approved, or induced, *if they request it"* (J.A. at 433 (emphasis in the original)); and a 1984 memorandum written by the Interagency Attorney Personnel Group, explaining that "when the performance of overtime work is 'induced' by supervisors it is compensable, even if not 'ordered or approved,'" (J.A. at 448). The record also includes a 1994 memorandum from then Assistant Attorney General Stephen R. Colgate establishing a Working Group to formulate attorney overtime policy and his 1996 recommendations to the Attorney General based on the findings of this Working Group, stating that "[a]ttorneys are rarely *ordered or approved* to perform overtime work, [but are] frequently *expected* to, and do, ... without extra compensation," (J.A. at 467 (emphasis in original)).

proach in recent years," *Doe I,* 54 Fed.Cl. at 407, and that "[t]he phrase 'ordered or approved' as used in the pay statutes became subject to broader interpretations, including inducement, encouragement, and perhaps expectation." *Id.* at 410. The court concluded that official inducement suffices to warrant compensation and that there was extensive documentation in the record establishing such inducement:

> [T]he Department of Justice informed attorneys that it expected them to work overtime when necessary. Authorized department officials testified that they understood the job to require overtime work. The Department's Manual states that attorneys should expect to work in excess of regular hours. These factors, along with management's understanding and approval of the process show that Department officials moved . . . into the area of "inducement."

*Id.* at 416 (citing *Byrnes v. United States,* 163 Ct.Cl. 167, 330 F.2d 986 (1963)). Finding that the "official policy at the Department of Justice has been to accept overtime work from its attorneys without paying for it," *id.,* the Court of Federal Claims held that because all such overtime was induced the "[c]lass members are entitled to overtime pay if they can meet the standards of proof required by law," *id.* at 405.

The Court of Federal Claims certified its summary judgment order for interlocutory appeal on the ground that "[j]udicial economy will be served by seeking appellate review of this court's liability determination before we address damages." *Doe II,* No. 98–896 C, slip op. at 1. The government timely petitioned our court for permission to take an interlocutory appeal. We granted this petition and have jurisdiction over the appeal pursuant to 28 U.S.C.

§ 1292(d)(2). *Doe v. United States,* Misc. No. 728 (Fed.Cir. Apr. 2, 2003).

## DISCUSSION

■ "We review the Court of Federal Claims' grant of summary judgment without deference." *Agwiak v. United States,* 347 F.3d 1375, 1377 (Fed.Cir.2003).

### I

FEPA was first enacted in 1945. Federal Employees Pay Act of 1945, ch. 212, 59 Stat. 295 (initially codified at 5 U.S.C. § 911; re-codified as amended at 5 U.S.C. § 5542). In its present form, the Act provides:

> For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or . . . in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for . . . at [the rates provided in 5 U.S.C. § 5542(a)(1)-(5)].

5 U.S.C. § 5542(a). This overtime requirement applies only to employees in Grade 15 or below, and an employee may not receive overtime if such payment would increase the employee's aggregate compensation in excess of the maximum allowable rate for Grade 15 employees. *Id.* § 5547. FEPA allows the head of an agency to "grant [an] employee compensatory time off from his scheduled tour of duty instead of payment under section 5542." *Id.* § 5543(a)(1). The head of an agency also may, with the approval of OPM, grant annual premium pay of up to twenty-five percent instead of overtime compensation when "an employee [is] in a position in which the hours of duty cannot

be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." *Id.* § 5545(c)(2).

FEPA expressly delegated rulemaking authority to the then Civil Service Commission, providing that "[t]he Civil Service Commission is hereby authorized to issue such regulations ... as may be necessary for the administration of the foregoing provisions of this Act." § 605, 59 Stat. at 304. Shortly after the Act was passed, the Civil Service Commission adopted an implementing regulation. *See* 10 Fed.Reg. 8,191, 8,194 (July 4, 1945). The Civil Service Commission was supplanted by OPM in 1978, which has since been responsible for FEPA regulations under identical statutory language. *See* Civil Service Reform Act of 1978, Pub.L. No. 95–454, § 906(a)(2), 92 Stat. 1111, 1224; *see also* 5 U.S.C. § 5548.[3] Substantially the same regulation has applied from 1945 to the present. The current regulation provides:

Authorization of overtime pay.

. . .

(c) Overtime work in excess of any included in a regularly scheduled administrative workweek may be ordered or approved *only in writing* by an officer or employee to whom this authority has been specifically delegated.

5 C.F.R. § 550.111 (emphasis added). For convenience, we refer to the regulation as the "OPM regulation."

## II

Beginning in the 1950s and ending in the 1970s, our predecessor court, the Court of Claims, repeatedly had occasion to consider FEPA and its accompanying regulations. Curiously, we have not had occasion to interpret the overtime provision of the statute or regulations in published opinions since that time.

In these Court of Claims cases, the government persistently argued that the OPM regulation did not permit overtime compensation unless an authorized official ordered or approved the overtime work in writing. As the Court of Federal Claims correctly noted here, the Court of Claims' early decisions agreed with the government, maintaining a strict interpretation of the statute and regulation to require prior official written authorization. In *Post v. United States*, 121 Ct.Cl. 94, 1951 WL 5358 (1951), the court in dictum described the OPM writing regulation as "a necessary safeguard against subjecting the Government to improper expense." *Id.* at 99. Soon thereafter in *Tabbutt v. United States*, 121 Ct.Cl. 495, 1952 WL 5985 (1952), the Court of Claims rejected a claim to overtime compensation brought by investigators who based their claim on the fact that their supervisors approved daily work records that reflected overtime. The court held that the supervisors' approval of these daily reports "could hardly be said to take the place of an order for these men to work overtime, or of an approval of their claim to compensation for having done so." *Id.* at 505.

The Court of Claims' insistence on written authorization or approval climaxed in *Gaines v. United States*, 132 Ct.Cl. 408, 131 F.Supp. 925 (1955), where it rejected a FEPA overtime claim. The plaintiff in

---

**3.** The current statute states: "The Office of Personnel Management may prescribe regulations, subject to the approval of the President, necessary for the administration of this sub-chapter ... insofar as this subchapter affects employees in or under an Executive agency." 5 U.S.C. § 5548(a).

*Gaines* worked for the Civil Aeronautics Administration in a position that "required a considerable amount of travel," and he claimed that "he was required to be on official duty in excess of the prescribed 40–hour work week." *Id.* at 926–27. The court discussed FEPA and the pertinent regulation, and it explained that "any claim [for overtime under FEPA] must be based upon the performance of overtime services which were expressly authorized or approved in writing by an officer or employee to whom such authority has been specifically delegated." *Id.* at 927. Finding no such authorization, and relying on *Post* and *Tabbutt,* the court entered summary judgment in favor of the government, stating: "[a]bsent the written authorization or approval as required by the statute and regulation, plaintiff is not entitled to recover." *Id.; see also Gray v. United States,* 136 Ct.Cl. 312, 313, 317 (1956) (dismissing plaintiff's FEPA overtime claim, which argued entitlement to compensation because authorized supervisors reviewed overtime work records and were aware of his overtime hours, "on the authority of *Tabbutt, . . . Post . . .* and *Gaines*" because the official authorized to approve overtime "did not at any time officially approve or order in writing any agent to work overtime").

The Court of Claims' 1956 decision in *Anderson,* 136 Ct.Cl. 365, took a dramatically different approach to the OPM regulation's written order requirement. In *Anderson,* no "overtime in excess of the administrative workweek was ordered or approved in writing" as required by the OPM regulation. *Id.* at 393. Indeed, "[i]n withholding written orders for or approval of the overtime, [the Agency's authorized officials] intended to withhold compensation for the services performed." *Id.* at 370. The court concluded that the sub- stantive purpose of FEPA was to ensure compensation for officially ordered or approved overtime work; that the regulation's procedural writing requirement could not be used to subvert the intent of the Act; and that the government could not refuse to pay compensation if it had orally "induced" its employees to work overtime. *Id.* at 371. It was "not disputed" that the plaintiffs worked beyond the forty-hour FEPA workweek and that the work of the Customs and Border Patrol agents involved "was not the kind of work which could be easily accommodated to a 5–day, 40–hour week." *Id.* at 367–68. According to the court:

> The failure of the Commissioner of Customs to translate the 40–hour week into administrative reality for the patrol inspectors, and his suggestion of "voluntary" overtime to the district superintendents and their subordinate supervisory officials, together with his knowledge of the use made by them in rationalizing the extension of "voluntary" overtime, afford ample evidence of approval of the overtime worked by the plaintiffs by an official with authority under the statute and the regulations to give such approval.

*Id.* at 370. Because "[t]he writing was required by the regulations, not by the statute" and because "[t]he withholding of written orders or approval reflected observance of the letter of the regulation but denial of the substance of the statute," it could not protect the government against FEPA liability. *Id.* at 370–71. According to the court, FEPA's "mandate to pay additional compensation for overtime hours, when the work was, as here, officially ordered or approved" overrides the regulation's procedural requirement. *Id.* at 371.

*Anderson* ushered in a series of cases where the court, following *Anderson,* awarded FEPA compensation for overtime induced by government officials even though there was no written order or written approval. These cases embraced *Anderson's* reasoning that the Civil Service Commission was without authority to attach procedural limitations to the substantive policy of FEPA. *See, e.g., Fix v. United States,* 177 Ct.Cl. 369, 368 F.2d 609, 613 (1966) (holding that the statute entitles an employee to compensation if "induced or required" to work overtime and that "[i]f the regulations attempt to lay down any other rule, they cannot stand since they would then be plainly inconsistent with the governing pay legislation as we have construed it"); *Rapp v. United States,* 167 Ct.Cl. 852, 340 F.2d 635, 641 (1964) (holding that the government's contention in denying overtime compensation "runs counter to the Federal Employees Pay Act of 1945" because, as *Anderson* stated, "the mandate to pay additional compensation for overtime hours, when the work was, as here, officially ordered or approved, is overriding" (quoting *Anderson,* 136 Ct.Cl. at 371)); *Adams v. United States,* 162 Ct.Cl. 766, 781 (1963) (relying on *Anderson's* theory that in circumstances where overtime work has been orally induced, "the mandate of the statute overrides the lack of written authorization or approval"). Therefore, as the plaintiffs here urge, these cases held the writing requirement invalid as inconsistent with the purpose of FEPA because it added a procedural requirement that was not reflected in the statute. [RB at 52].

To some extent, these cases also suggested that equitable considerations prevented the government from denying overtime compensation where it "induced" overtime work. *See Baylor v.* *United States,* 198 Ct.Cl. 331, 360 (1972) ("To allow defendant to avoid payment of overtime compensation because it chose to require overtime indirectly rather than directly would obviously be inequitable."); *Adams,* 162 Ct.Cl. at 784 (explaining that denying recovery for induced overtime would permit "[t]he officials of the Department of Justice [to] commit[ ] a wrong" for which their employees "would be without remedy" and that "[t]he inequity of such a result is manifest"); *see also McQuown v. United States,* 199 Ct. Cl. 858, 866, 1972 WL 123052 (1972) (congressional reference opinion by a review panel of commissioners of the Court of Claims, holding that the plaintiff "was induced and coerced by his supervisors ... with the knowledge and approval of officials authorized to approve overtime work, ... thereby estopping the defendant from relying on the provisions that overtime must be officially ordered or approved in writing").

## III

Court of Claims decisions are, of course, binding upon us unless undermined by intervening Supreme Court or *en banc* authority. *Bankers Trust N.Y. Corp. v. United States,* 225 F.3d 1368, 1373 (Fed. Cir.2000) (citing *Tex. Am. Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1561 (Fed.Cir.1995) (*en banc* )); *see also S. Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982) (*en banc* ). The problem is that the Court of Claims decisions discussed in the preceding section are not consistent with each other. The Court of Federal Claims aptly observed here that "an employee seeking overtime can likely find an opinion of [the Court of Claims] that fits his situation regardless of what it may be." *Doe I,* 54

Fed.Cl. at 410 (quoting *Anderson*, 201 Ct. Cl. at 675 (Skelton, J., dissenting)). The plaintiffs argue that we should continue to reject the writing requirement as did our predecessor court in the more recent *Anderson* line of cases. The government urges that we follow *Gaines* and the earlier cases that strictly enforced the written order requirement on the theory that under the principle of stare decisis, "[t]he *Anderson* panel had no more authority to 'discard' prior cases than any other panel." (Reply Br. for the Appellant at 17.) In this respect we agree with the plaintiffs. When the Court of Claims sat *en banc*, as it typically did in the *Anderson* line of cases, we are obligated to follow the court's most recent decision because an *en banc* court may modify or effectively overrule its earlier decisions. *See George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351–52 (Fed.Cir.2003).

Alternatively, the government urges that the opinions in the *Anderson* line of inducement cases were all decided before the Supreme Court's decision in *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), and that *Hansen* effectively overruled these cases. We agree. In holding that the OPM regulation was invalid because it added a procedural writing requirement to the substantive requirements of FEPA or because the result was inequitable, the *Anderson* line of cases is inconsistent with *Hansen*.

*Hansen* involved the Social Security Act, which extended benefits to a person who "has filed application." 42 U.S.C. § 402(g)(1)(D) (1976). Benefits could be paid retroactively for the twelve months prior to the filing of an application. *Id.* § 402(j)(1). The regulations promulgated pursuant to the Social Security Act required the application to be in writing, 20 C.F.R. § 404.602 (1974), and the Social Security manual required administrators to inform applicants that their applications must be filed in writing, *Hansen*, 450 U.S. at 786, 101 S.Ct. 1468. When the plaintiff orally applied for benefits, the Social Security administrator erroneously informed her that she was not entitled to benefits and, in violation of the manual, failed to inform the plaintiff that the regulations required her to file a written application. *Id.* The plaintiff subsequently learned that she was entitled to benefits, and she filed a written application, including a claim for retroactive benefits for the twelve months prior to her oral application. *Id.* at 786–87, 101 S.Ct. 1468. This claim was denied. While the facts of *Hansen* were substantially similar to those in the *Anderson* line of cases, the plaintiff's challenge to the writing requirement in *Hansen* was more limited. Rather than suggesting that the writing requirement was entirely invalid, the plaintiff urged that the regulation was entitled to less respect than the substantive policies of the statute and that the agency could therefore be estopped from relying on the regulation's writing requirement.

The Second Circuit held in favor of the plaintiff, and the Supreme Court described this decision in language that echoed the *Anderson* line of cases: "[the Second Circuit] considered the [regulation's] written-application requirement a mere 'procedural requirement' of lesser import than the fact that [the plaintiff] ... had been 'substantively eligible' for the benefits" under the statute. *Id.* at 787, 101 S.Ct. 1468. The Court concluded:

> [*The Second Circuit's] majority's distinction between [the plaintiff's] "substantiv[e] eligib[ility]" and her failure to satisfy a "procedural requirement"*

*does not justify estopping petitioner in this case.* Congress expressly provided in the Act that only one who "has filed application" for benefits may receive them, and it delegated to petitioner the task of providing by regulation the requisite manner of application. *A court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits.*

*Id.* at 790, 101 S.Ct. 1468 (emphases added) (third and fourth alterations in original). In so holding, the Supreme Court necessarily concluded that the writing requirement was not invalid simply because it added an additional procedural requirement to the substantive requirements of the statute. This result is directly at odds with the *Anderson* line of cases.

After *Hansen,* in *Boulez v. Commissioner,* 810 F.2d 209 (D.C.Cir.1987), the District of Columbia Circuit sustained a Treasury regulation's addition of a writing requirement to the Internal Revenue Code's provision regarding compromise agreements with the Internal Revenue Service. *Id.* at 212–13. The court quoted the Supreme Court's earlier instruction that it is "the duty of all courts to observe the conditions defined by Congress for charging the public treasury," *id.* at 218 n. 68 (quoting *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 92 L.Ed. 10 (1947)), and it explained that *Hansen* taught that this "principle is no different where the requirement is promulgated by the agency charged by Congress with administering a statute," *Boulez,* 810 F.2d at 218 n. 68 (citing *Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685); *see also Am. Airlines, Inc. v. Austin,* 75 F.3d 1535, 1541–42 (Fed.Cir.1996). The court further

elaborated on *Hansen's* reasoning, explaining that the Supreme Court held that "no distinction between substantive and procedural requirements suffices to mitigate the court's responsibility to ensure observance of regulations governing claims on the public fisc." *Id.* (citing *Hansen,* 450 U.S. at 790, 101 S.Ct. 1468).

The *Anderson* line of cases fares no better if it is viewed as resting on "equitable" considerations. *Hansen* directly held that such considerations could not impose liability on the government, 450 U.S. at 790, 101 S.Ct. 1468, a result reinforced in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The plaintiff in *Richmond,* a recipient of federal disability annuity, was given an outdated publication in 1986 that incorrectly advised him that he could work without forfeiting his disability payments. 496 U.S. at 417–18, 110 S.Ct. 2465. The plaintiff's disability payments were terminated once he began working. He argued that the government was estopped from terminating his benefits because it gave him incorrect advice. *Id.* at 418, 110 S.Ct. 2465. The Court stated that "[a]ll parties here agree that the award [the plaintiff] seeks would be in direct contravention of the federal statute upon which his ultimate claim to the funds must rest." *Id.* at 424, 110 S.Ct. 2465. Relying on *Hansen,* the Court rejected the plaintiff's estoppel claim because "the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized." *Id.* at 426, 429, 110 S.Ct. 2465. While *Richmond* addressed a statutory limitation, the opinion cited *Hansen* in support of its holding, which treated statutory and regulatory requirements concerning the payment of money from the Treasury as equally binding. *Id.* at 429, 110 S.Ct. 2465. Expressly following *Hansen*

and *Richmond,* our court held in *Koyen v. Office of Personnel Management,* 973 F.2d 919 (Fed.Cir.1992), that "[t]he Supreme Court has left no doubt that it is 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'" *Id.* at 922–23 (quoting *Hansen,* 450 U.S. at 788, 101 S.Ct. 1468). We therefore denied compensation "despite the equities" in favor of compensation because "we [we]re bound by the dictates of *Richmond.*" *Id.* at 923.

■ Thus, to the extent that the *Anderson* line of Court of Claims cases held that the Civil Service Commission was without authority to impose a "procedural" written order requirement because it restricted the substantive scope of the overtime statute or because of equitable considerations, they are inconsistent with *Hansen* and *Richmond.* In light of *Hansen* and *Richmond,* we are compelled to hold that the *Anderson* line of cases is no longer good law and that the written order requirement is not invalid on the ground that it imposes a procedural requirement that limits the right to overtime compensation under the statute or because it is inequitable. *See Bankers Trust,* 225 F.3d at 1373. We address below the plaintiffs' arguments that the writing requirement is invalid under the statute for other reasons.

A

■ The plaintiffs assert that the writing requirement is only "an administrative direction to employing agencies concerning procedures for administering overtime—

not an attempt to limit the statutory pay entitlement Congress had enacted for federal employees." (Br. for Appellees at 32.) The plaintiffs argue that FEPA itself limits OPM's role to that of establishing merely administrative regulations.

Although there are some situations in which a statutory or regulatory requirement is purely an administrative directive that is not enforceable in litigation,[4] the OPM regulation here is not such a regulation. FEPA provides that "[t]he Office of Personnel Management may prescribe regulations ... necessary *for the administration* of this subchapter." 5 U.S.C. § 5548(a) (emphasis added). We held in *Contreras v. United States,* 215 F.3d 1267 (Fed.Cir.2000), that the Annual and Sick Leave Act of 1951, 5 U.S.C. 6301–6387, in which "Congress authorized OPM to issue regulations 'necessary for the administration'" of the Act, allows OPM to "fill gaps in the statutory scheme left by Congress if it does so in a manner that is consistent with the policies reflected in the statutory program." *Id.* at 1274 (quoting 5 U.S.C. § 6311). We see no reason why FEPA's similarly phrased mandate to OPM should be interpreted any differently. OPM was not limited by the statute to promulgating merely administrative directives, but was empowered to issue regulations setting forth substantive requirements.

In fact, Congress relied heavily on the Civil Service Commission, OPM's predecessor, to promulgate substantive standards for overtime statutes even before the passage of FEPA. For example, in the War Overtime Pay Act of 1943, ch. 93, 57

4. *See, e.g., Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 159, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (holding that where a statute requires an agency to take certain action by a specific date, "if [the] statute does not specify a consequence for noncompliance with statutory tim-

ing provisions, the federal courts will not in the ordinary course impose their own coercive sanction") (quoting *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993)).

Stat. 75, Congress invested the Civil Service Commission with the power "to promulgate such rules and regulations as may be necessary and proper for the purpose of coordinating and supervising the administration" of the overtime statute. *Id.* § 9, 57 Stat. at 77. Although the Act itself entitled federal employees to overtime compensation without any reference to the procedure for authorizing overtime work, the Civil Service Commission's regulations limited the authority to order overtime to "officer[s] or employee[s] to whom such authority has been specifically delegated by the head of the department or agency." 5 C.F.R. § 20.9 (1943 Supp.). Congress incorporated the substance of the Civil Service Commission's standard in FEPA, thus suggesting approval of the Civil Service Commission's broad exercise of its rulemaking power.

Contrary to the plaintiffs' claim, we also note that OPM did not intend in the regulation to establish a mere administrative instruction. The OPM regulation was clearly designed to interpret or expound upon the FEPA's "officially ordered or approved" requirement, 5 U.S.C. § 5542(a). This intention is highlighted by the regulation's usage of parallel language: "Overtime work ... may be *ordered or approved* only in writing," 5 C.F.R. § 550.111(c). None of the prior cases has suggested that the regulation should be interpreted as a mere administrative instruction.

### B

■ We next consider whether OPM's regulation is entitled to *Chevron* deference, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* contemplates a two-step analytic process. *Id.* at 842, 104 S.Ct. 2778. First, we ask "whether Congress has directly spoken to the precise question at issue"; if so, we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is ambiguous, we proceed to *Chevron* step two: "whether the agency responsible for filling a gap in the statute has rendered an interpretation that 'is based on a permissible construction of the statute.' " *Koyo Seiko Co. v. United States,* 258 F.3d 1340, 1346 (Fed.Cir.2001) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

The first step of the *Chevron* analysis here centers on the phrase "ordered or approved." FEPA does not specify the form in which overtime must be "ordered or approved," and these words are ambiguous as to whether they refer to written or oral authorization or both. Dictionaries at the time FEPA was enacted in 1945 make clear that the term "order" may refer to either a written or oral direction. *See* VII *A New English Dictionary on Historical Principles* 183 (1st ed.1909) [the second edition of which is known as the Oxford English Dictionary] ("23. An authoritative direction, injunction, mandate; a command, oral or written; an instruction."); *see also Webster's New International Dictionary* 1716 (2d ed.1939) ("3. To give an order to; to command"). So too, modern dictionaries make clear that an order may refer to either an oral or written order. *See* X *The Oxford English Dictionary* 905 (2d ed.2004) ("23. a. An authoritative direction, injunction, mandate; a command, oral or written; an instruction."); *Webster's Third New International Dictionary* 1587–88 (2002) (providing various definitions for an "order," including "a formal written authorization to deliver materials, to perform work, or to do both"). The

term "approve" is broad enough to connote an oral or written approval. *See* I *A New English Dictionary on Historical Principles* 416 (1st ed. 1888) ("5. to confirm authoritatively; to sanction."); *Webster's New International Dictionary* 133 ("3. To sanction officially; to ratify; to confirm"); *see also Webster's Third New International Dictionary* 106 ("5a: to express often formally agreement with and support of or commendation of as meeting a standard"). Since the statutory terms "order" and "approve" are broad enough to encompass either written or oral communications (or both), these terms are ambiguous. *See, e.g., Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 741–742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996); *see also, Boulez,* 810 F.2d at 212 ("Section 7122(a) is facially ambiguous. It does not specify that compromise agreements must be in writing, nor does it explicitly sanction oral settlements."). There is no suggestion here that this ambiguity may be resolved by resort to FEPA's legislative history or by other traditional tools of statutory construction. Clearly, the first *Chevron* requirement—ambiguity—is present.

We then turn to the second *Chevron* analytic step. The Supreme Court has recognized that "a very good indicator" of the applicability of "*Chevron* treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings." *United States v. Mead Corp.,* 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Pesquera Mares Australes v. United States,* 266 F.3d 1372, 1380 (Fed.Cir.2001). The OPM regulation, adopted "[b]y virtue of the authority vested in the U.S. [sic] Civil Service Commission by section 605 of the Federal Employees Pay Act of 1945," Exec. Order No. 9,578, 10 Fed.Reg. 8,191 (July 4, 1945), has

the necessary degree of formality to warrant *Chevron* deference. Under *Chevron,* if a statutory term "is ambiguous, the [agency's] regulation implementing [it] 'is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Household Credit Servs., Inc. v. Pfennig,* —— U.S. ——, 124 S.Ct. 1741, 1748, 158 L.Ed.2d 450 (2004) (quoting *Mead Corp.,* 533 U.S. at 227, 121 S.Ct. 2164). We have said that the party contesting the regulation "bear[s] the burden of showing that the agency's approach is arbitrary or otherwise unreasonable." *Koyo Seiko Co.,* 258 F.3d at 1347. The plaintiffs here have not met this burden with respect to OPM's regulation.

The plaintiffs argue that the OPM regulation is an unreasonable interpretation of FEPA that is not entitled to *Chevron* deference, relying on the Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002), because the regulation's addition of a writing requirement is contrary to FEPA. In *Ragsdale,* the Supreme Court held invalid a regulation under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* (2000), which allowed monetary recovery for an employer's technical violation of the regulation without a showing of the prejudice to the employee. 535 U.S. at 84, 88, 122 S.Ct. 1155. The statute, however, expressly required an employee to show actual prejudice from an employer's actions as a prerequisite to compensation. *Id.* at 89, 122 S.Ct. 1155. The Supreme Court held that "[a] regulation cannot stand if it is ... manifestly contrary to the statute." *Id.* at 86, 122 S.Ct. 1155 (quoting *United States v. O'Hagan,* 521 U.S. 642, 673, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997)) (internal quotation marks omitted). Likewise, in

*Brown v. Gardner*, 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994), the Supreme Court invalidated a Department of Veterans Affairs regulation that required veterans to prove negligence on the part of the Veterans Administration in order to recover certain benefits that the statute mandated simply upon proof of injury. *Id.* at 120, 115 S.Ct. 552.[5]

These Supreme Court decisions do not help the plaintiffs in the present case because the OPM regulation's written order requirement does not contradict the language of FEPA. FEPA merely limits compensation to those employees whose overtime work has been "officially ordered or approved." 5 U.S.C. § 5542(a). This statement in and of itself is not at odds with the regulation's writing requirement, nor does it suggest that inducement is sufficient to constitute official order or approval. And the Act clearly contemplated that overtime would be "ordered or approved" through a somewhat formal procedure by providing an exception where such procedure is impossible. Where formal control is impractical, such as if "an employee [is] in a position in which the hours of duty cannot be controlled administratively" and "requires substantial amounts of irregular, unscheduled overtime duty," FEPA allows the employee to "receive premium pay for this duty on an annual basis . . . [at] an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position." 5 U.S.C. § 5545(c)(2).

Significantly too, the Fair Labor Standards Act of 1938, ch. 676, 52 Stat. 1060 (codified as amended at 29 U.S.C. §§ 201–219) ("FLSA"), enacted before FEPA, incorporated a different standard for overtime compensation that allowed recovery for inducement. Under FLSA, an employee is entitled to overtime pay if the employer "suffer[s] or permit[s]" the employee to work overtime.[6] 29 U.S.C. § 203(g); *see also* 29 C.F.R. § 785.11 (2003).[7] The Supreme Court has repeatedly emphasized the expansive nature of this particular language, stating that "[a] broader or more comprehensive coverage of employees . . .

---

**5.** The plaintiffs also cite two of this court's cases holding that regulations that are inconsistent with statutes are invalid. *See Torres v. Office of Pers. Mgmt.*, 124 F.3d 1287, 1289–90 (Fed.Cir.1997) (invalidating an OPM regulation that required an employee to have worked at least 30 days in a particular agency before qualifying for early retirement because it was "contrary to the clear intent" of the statute, which "clearly and plainly delegated only . . . very specific limited tasks to OPM" to determine "where in the country the early retirement offer would be made, not when in time"); *Horner v. Hollander*, 895 F.2d 759, 760–61 (Fed.Cir.1990) (invalidating an OPM regulation because it "r[an] counter to the plain meaning of the language" of the statute at issue because retirement eligibility under the statute "cannot reasonably be limited to" the class defined in the regulation).

**6.** In 1974 the FLSA was applied to federal employees, Fair Labor Standards Act Amendments of 1974, Pub.L. No. 93–259, § 6(a), 88 Stat. 55, 58 (codified as amended at 29 U.S.C. § 203). The FLSA, however, exempts "[e]mployee[s] employed in a . . . professional capacity" from its purview, and the attorneys here involved were not covered by the FLSA because they fell under this professional exemption. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.3(a)(1).

**7.** "Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time." 29 C.F.R. § 785.11.

would be difficult to frame." *United States v. Rosenwasser,* 323 U.S. 360, 362, 65 S.Ct. 295, 89 L.Ed. 301 (1945); *see also, e.g., Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *Tony and Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 300 n. 21, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). Our sister circuits have interpreted this standard as requiring only that an employer "knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity." *Mumbower v. Callicott,* 526 F.2d 1183, 1188 (8th Cir.1975) (internal quotation marks and citations omitted); *see also, e.g., Pabst v. Okla. Gas & Elec. Co.,* 228 F.3d 1128, 1133 (10th Cir.2000); *Holzapfel v. Town of Newburgh, NY,* 145 F.3d 516, 524 (2d Cir.1998); *Newton v. City of Henderson,* 47 F.3d 746, 749 (5th Cir. 1995); *Reich v. Dep't of Conservation and Natural Res.,* 28 F.3d 1076, 1082 (11th Cir.1994); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981). The lack of such language in FEPA at least suggests that the Act's requirement that overtime be "officially ordered or approved," 5 U.S.C. § 5542(a), cannot be satisfied by merely "suffer[ing] or permit[ting]," 29 U.S.C. § 203(g), overtime. This further supports OPM's view that FEPA's "ordered or approved" language can reasonably be interpreted to require a more formal means of authorization.

The writing requirement also serves an important purpose of the statute—to control the government's liability for overtime. This purpose is discussed in the Act's legislative history. During the 1945 hearings before the House Committee on the Civil Service regarding FEPA, a Commissioner of the Civil Service Commission, Arthur Flemming, testified on behalf of the government in support of the proposed legislation, including the overtime provision. Commissioner Flemming's testimony suggested that FEPA had the dual purpose of ensuring that employees received overtime compensation while adequately controlling the government's obligation to pay overtime so as not to subject the Treasury to unanticipated liabilities. *Salary and Wage Administration in the Federal Service: Hearing on H.R. 2497 and H.R. 2703 Before the House Comm. on the Civil Service,* 79th Cong. 42 (1945). Commissioner Flemming described FEPA's provisions, including the overtime pay provision, explaining its benefits:

> Looking at it from the standpoint of government, as an employer, ... [i]f adequate controls are maintained over appropriations, the extra expense involved in overtime will discourage its use, and, in the long run, encourage better management.

*Id.* Representatives repeatedly questioned Commissioner Flemming on the oversight mechanisms included in the proposed legislation that would control the distribution of overtime pay. Representative Miller, for example, stated that "the final check ... is the money that will have to be very definitely set up in the budgets of the departments for overtime pay," and Representative Vursell communicated that he was "fearful that you [*i.e.,* Commissioner Flemming as the government's champion of the overtime provision] don't have that check." *Id.* at 51. Representative Miller elaborated on Congress' concern that there be adequate controls on the payment of overtime compensation: "if I am a $6,000 executive I just can't come in the morning and say, 'I decided to stay at the office last night for 2 hours and, therefore, I want

$1.75 an hour.'" *Id.* Commissioner Flemming responded to these concerns, explaining:

> [T]he proposed section states that they get additional compensation for all hours of employment officially ordered or approved in excess of 40 hours. And, speaking now for my own agency, I know that the regulations under which overtime is ordered and co[m]pensated for are very strict, and in most instances requests for approval have to come all the way to the top.

*Id.*

Finally, deference is particularly warranted in this case because OPM's regulation was enacted almost contemporaneously with the statute. *See Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979); *Baird v. Sonnek*, 944 F.2d 890, 894 (Fed.Cir.1991).

In summary, we find that the OPM regulation interprets an ambiguous statute that it was expressly authorized to administer. OPM's construction of the phrase "ordered or approved," as requiring written authorization, is reasonable and entitled to *Chevron* deference because it comports with, and indeed furthers, the language and purpose of FEPA.

## IV

This leads to the question whether the writing requirement was satisfied in this case. The plaintiffs contend that the written order requirement was satisfied here, citing a wide variety of writings that allegedly ordered and approved overtime work. These writings include a 1996 memorandum from former Assistant Attorney General Colgate, a pamphlet from the Office of the Attorney General entitled "General Office Information," an administrative bulletin from the Environmental and Natural Resources Division entitled "Professional Timekeeping," an Environmental and Natural Resources Division 1998 manual entitled "Case Management Policy and Procedures Manual," a 1996 document from the Case Management Staff of the Executive Office for United States Attorneys entitled "Overview of the United States Attorneys' Monthly Resource Summary Report," and the United States Attorneys' Manual (the "Manual"). There are two problems with these writings.

■ First, the vast majority of the writings cited by the plaintiffs were not written by officials with proper delegated authority to "officially order[ ] or approve[ ]," 5 U.S.C. § 5542(a), overtime. Just as the terms "ordered" and "approved" are ambiguous, so too the term "officially" is ambiguous. *See Reno v. Koray*, 515 U.S. 50, 60–61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (recognizing that the term "officially" in the statutory phrase "officially detained" was ambiguous). Under *Chevron*, OPM was authorized to define the term "officially" in the regulations. The OPM regulation explains that an order or approval is only official if made "by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c). The plaintiffs appear again to urge that this regulatory requirement is either merely an administrative instruction or invalid. We reject these contentions with respect to this portion of the regulation just as we have rejected these contentions with respect to the written order requirement. Indeed, one of the more recent Court of Claims cases addressing this issue held that overtime must be authorized by "an officer or employee to

whom this authority has been specifically delegated" as required by the OPM regulation, 5 C.F.R. § 550.111(c), and it denied compensation because the plaintiffs were not instructed to work overtime by "officials designated by the regulation to authorize overtime." *Bilello v. United States*, 174 Ct.Cl. 1253, 1257 (1966).

While the Court of Federal Claims indicated that the "parties agree that former Assistant Attorney General Colgate was the only person who had authority to order or approve overtime for the entire Class," *Doe I*, 54 Fed.Cl. at 414; *see also* 28 C.F.R. § 0.145 (2003), the plaintiffs in this court appear to assert that "[t]he Attorney General, the Deputy Attorney General, the Associate Attorney General, and the Assistant Attorney General for Administration all had authority to authorize overtime work." (Br. for Appellees at 15.) Assuming that the plaintiffs are correct on this point, the majority of the orders or approvals they cite were not made by officials on this list.

▆ Second, even those writings that were arguably issued by officials who were arguably authorized to order overtime are not orders or approvals within the meaning of the statute and regulation. The plaintiffs argue in particular that the Manual, *available at* http://www.usdoj.gov/usao/eousa/foia—reading—room/usam/, which is binding on Assistant United States Attorneys as well as all attorneys in the DOJ's litigation division, 28 C.F.R. § 0.22(b), satisfied the writing requirement. Because the *Manual* was prepared by the Executive Office for United States Attorneys under the supervision of the Attorney General and the direction of the Deputy Attorney General, *see* United States Attorneys' Manual, § 1–1.200, the plaintiffs contend that it constituted an

official order to work overtime from the Attorney General. Assuming, without deciding, that the *Manual* constitutes a written statement of the Attorney General, the Manual still does not provide the requisite writing. The Manual does not order attorneys to work any amount of overtime—it does not even, as the plaintiffs contend, order an indefinite number of overtime hours. The plaintiffs correctly quote the Manual as stating that:

> United States Attorneys are NOT authorized to approve overtime premium pay for attorney personnel. Assistant United States Attorneys are professionals and should expect to work in excess of regular hours without overtime premium pay.

*Id.* § 3–4.550. However, this statement instructs attorneys not to expect overtime compensation rather than instructing them to work particular amounts of overtime. The Manual repeatedly emphasizes the following two directives: "overtime under 5 U.S.C. § 5542 must be approved in writing, in advance, by a person authorized to do so" and "U.S. Attorneys are *not* authorized to approve overtime for attorney personnel," (J.A. at 414, 416 (the 1988 and 1992 Manuals) (emphasis added)), indicating, if anything, that the plaintiffs' overtime work was not officially ordered or approved. The other writings on which the plaintiffs rely are even less supportive of their claim. We have reviewed each of these documents, and none of them includes an express directive to work overtime, and none communicates the approval of overtime work by those officials authorized to order overtime.

▆ Finally, the plaintiffs point to the fact that the DOJ maintained two sets of records of attorneys' work, one of which was used for pay purposes and reflected

forty hours of work a week per attorney, while the other was generally used for calculating attorneys fees and budget requests and reflected the number of hours worked by each attorney beyond the standardized forty-hour workweek. The plaintiffs contend that because "[a]uthorized officials received monthly or quarterly summaries and compilations of these records" the practice of maintaining these two sets of records reflects "approval under FEPA." (Br. for Appellees at 23–24 (internal quotation marks and alterations omitted)). This practice does not, however, provide the plaintiffs with the written order or approval necessary to justify compensation under FEPA and its regulations. The maintenance of two sets of records may indicate official awareness of the overtime worked, but it does not provide prior written authorization or approval of such work.

### V

In holding that the DOJ is not liable for overtime on an inducement theory, we do not wish to be seen as countenancing any effort by DOJ or any other agency to evade the requirements of FEPA and the OPM regulation. Our predecessor court was legitimately concerned that at least in some instances such evasion had occurred and that the government in effect was coercing uncompensated overtime. The government's brief in this case candidly admits that DOJ attorneys were expected to work overtime without compensation. If an adverse personnel action were taken against an employee who declined to work uncompensated overtime, that action might well be found to be invalid.[8] But that is not a ground for awarding overtime compensation that was not ordered and approved in strict compliance with the regulation. The problems that this case has exposed suggest that DOJ and other affected agencies might do well to reexamine the whole overtime question for employees not subject to the FLSA and seek a government-wide legislative solution.[9]

### CONCLUSION

For the foregoing reasons, we reverse the Court of Federal Claims' grant of summary judgment.

*REVERSED*

### COSTS

No costs.

---

8. The government itself stated:

    To the extent that some class members believed that individual supervisors were acting inappropriately, they had various avenues of recourse. They could have refused to work extra hours. If penalized, they could have challenged any significant adverse personnel action before the Merit Systems Protection Board, with judicial review in this Court. And ... they could have reported any suspected FEPA violations to OPM or the Justice Department's Inspector General for investigation; or sought relief through an administrative grievance system that the Justice Department maintains; or challenged the government's overtime policies through the Administrative Procedure Act, to the extent that the CSRA's remedies were not exclusive.

    (Br. for Appellant at 61 (citations omitted).)

9. As noted above, *supra* n. 1, Congress enacted legislation in 1999 that prohibited overtime compensation for DOJ attorneys after November 29, 1999.